PRESS PUBLISHING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NEWSPAPER PRINTING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 22475, 29385, 32380. Promulgated September 24, 1929.

*Paul Patterson, Esq., J. G. Marks, Esq.,* and *Henry O. Evans, Esq.,* for the petitioners.

*E. M. Niess, Esq.,* for the respondent.

454

456

OPINION.

LOVE: On the very face of the admissions of these petitioners contained in the record, we have no alternative but to hold for the respondent, and we so do.

We quote again, for the purpose of emphasis, paragraph 3 of the stipulation:

The purpose of said Newspaper Printing Company, Press Publishing Company, and Post Publishing Company in causing said Union Publishing Company to be created was to provide an agency by means of which the papers known as The Leader and the Dispatch could be purchased and the publication of those papers discontinued.

Here is a declaration by the petitioners that the Union Publishing Co. was nothing more nor less than the "agency" or instrumentality of those who caused it to be created (and who with the Post Publishing Co. became its sole stockholders and the guarantors of its otherwise worthless bonds) for the sole purpose of purchasing the newspapers known as "The Leader" and "The Dispatch," and immediately thereafter discontinuing their publication. Such was the purpose and such, in fact, was the result accomplished.

Counsel for the respondent asks us to ignore the separate existence of a corporation which was used as the mere agent or instrumentality of another corporation. Counsel cites us to a number of cases and quotes from some of them. See *Muncie Pulp Co.*, 139 Fed. 546; *Pevely Dairy Co.*, 1 B. T. A. 385; *Regal Shoe Co.*, 1 B. T. A. 896; *Record Abstract Co.*, 2 B. T A. 628; *Market Supply Co.*, 3 B. T. A. 841; *Champion Coated Paper Co.*, 10 B. T. A. 433; *Edwin R. Crawford*, 11 B. T. A. 1299; *George. L. Rickard*, 15 B. T. A. 316.

On the other hand, counsel for the petitioners strongly urge that we are bound by precedent to respect the corporate entity (citing *Regal Shoe Co.*, *supra*) except only "in extreme cases where it was necessary to prevent fraud or avoid an inequitable result." Counsel is quick to assert that here is "no question of fraud," which is not charged, and adds "nor is there any inequitable result," with which we do not agree.

Nevertheless, we concede the separate corporate entity of the Union Publishing Co. and that the subsequent transactions were car-

ried out as if by it; but we hold that it acted not on its own behalf nor as a free agent, but as the " agency " or instrumentality of those who brought it into existence for this very purpose and no other.

The Union Publishing Co., so called, was never a publishing company in fact; its stockholders never subscribed to its stock nor guaranteed its bonds with any expectation of commercial gain, or that they would ever get a return of capital in the form in which it was turned over to the Union Publishing Co. or placed at its disposal as an available credit with the Union Trust Co. It was created as an agency through which the three newspaper corporations who formed its sole stockholders might purchase and destroy, as they did purchase and destroy " The Leader " and " The Dispatch."

E. R. Stowl testified that in 1923 he was secretary of the Pittsburgh Newspaper Publishers Association and that in that year he was made also manager of the Union Publishing Co. In that capacity he took charge of the property of the Leader and Dispatch, and on the day of their purchase he discontinued their publication and closed their plants. He disposed of some of their properties and the remainder, " machinery and stuff like that," to the value of $91,550, according to Charles B. Davis, trust officer of the Union Trust Co., was turned over to the Union Trust Co., according to the testimony of both Stowl and Davis, by assignment from the Union Publishing Co. to the Union Trust Co. as liquidating trustee. The total amount of such credits to the guarantors does not appear in the record, but it may be approximated as the difference between the total amount of the bonds, $1,590,000 and the amount of $1,315,390.48 which the guarantors were called upon to pay between February 1, 1924, and February 1, 1928; that is to say, about $275,000, so that it is evident that some tangible assets of substantial value were involved in the transaction.

But it is not important to inventory the benefits received by these petitioners in exchange for their admitted outlay of $438,416.14 each. The inescapable fact is that the actual value of the assets, either tangible or intangible, of both the Leader and the Dispatch was no more, at the most, than a secondary consideration in the price demanded by their owners for their extinction, which was the *desideratum* sought and for which the purchasers were willing to pay.

The witness, Stowl, testified on cross-examination that:

The object was *simply* to dispense with these newspapers on the theory there were more newspapers in the town than could live from the income which was derived from whatever revenues are possible for a newspaper to earn. (Italics ours.) ·

Counsel offers an ingenious, rather than an ingenuous, argument against the presumption that these petitioners " *must* have received *some* benefit," which thought is characterized as being " obviously

458

highly speculative." In our judgment the speculation is rather a safe one, nor can we readily believe that the astute business men of Pittsburgh who are his clients here were in a "highly speculative" frame of mind when at their special directors' meeting of February 13, 1923, they recorded their deliberate opinion that the purchase by the Union Publishing Co. of " the property and assets " of the Dispatch Publishing Co. and the Leader Publishing Co. " will enure greatly to the benefit of the business of this Company," and " for value received " authorized and directed the guaranty by their company of bonds of the Union Publishing Co. to the " aggregate par value of $540,000 " and " authorized and directed " the officers of the company to execute the guaranty " on that amount of such bonds in the name of this company and under its corporate seal."

So that whether the purchase price paid was too great or too little, is immaterial; it was the fair market value as between these purchasers and sellers, of what these petitioners expected to acquire; it was the price that they themselves had established and agreed to; and whether the purchase price was paid for " good will " or for " nuisance value," or whatever else, is a matter of equal unimportance. They got just what they wanted to buy and did buy, and there is no evidence that it proved to be of less value than they appraised it at the time of purchase. In our opinion it was paid for an undepreciable asset and it is therefore a capital expenditure not deductible as a loss in any year.

It is our opinion, too, that the transaction is that of these petitioners and their associate, the Post Publishing Co., through their agency, the Union Publishing Co., as clearly and undeniably as it would be in the case of an individual who deputized another to purchase a property for him, saying: " Raise the money required on your own note to which I will give my endorsement. When the transaction is completed and the property or its equivalent turned over to me or applied on the note, I will pay the remainder of your note and hold you harmless." Certainly such a transaction could not give rise to a deductible loss in the tax return of the principal any more than if he had himself completed the purchase without the intervention of the second party; and in this case we can not distinguish between such a transaction of real persons and the similar case here between artificial persons created by law, where every cent of the cash required for the purpose for which the Union Publishing Co. was brought into existence was furnished by these petitioners and their associate either directly or upon their credit. We do not believe that, under the circumstances here existing, the Union Publishing Co. ever came into the unrestricted title to these funds so raised, but rather as the trustee or agency through which the purposes of its stockholders and guarantors of its bonds were to be

carried out; we believe that such trusteeship was so impressed upon these funds that if, as is conceivable, its directors representing two-thirds of its stock had voted to apply these funds to another purpose altogether, an action for conversion would lie in favor of the other one-third party in interest. Among other decisions and rulings, counsel for the petitioners cites *Marr* v. *United States*, 268 U. S. 536. We have examined that decision carefully but find nothing in it that we think is in point here. We do find, however, a decision of the Supreme Court of Pennsylvania which seems to us to antici-pate our reasoning in this case by about thirty-six years, and as all the corporations here involved are creations of that Commonwealth, we quote from it as being of interest. The case is *Commonwealth* v. *Fall Brook Coal Co.*, decided July 19, 1893, on appeal from the Court of Common Pleas of Dauphin County, and reported in 156 Pa. St. 488; At. Rep., vol. 26, p. 1071.

The question therein considered was a double assessment of a capital stock tax, which had been sustained by the court below and which was reversed by the Supreme Court. In the course of its opinion the court found it necessary to consider the relationship that existed between the Fall Brook Coal Co. and the Fall Brook Railway Co. built to convey the products of the mines to market, all the stock of the railway company being owned by the coal company. The part of the court's opinion which we regard as relevant follows:

There is a very plain distinction between the title and the position of a trustee and the title of the cestui que trust, but the trust estate is one and the same. The legal title to the estate is in the trustee. An equitable title to the same estate is in the cestui que trust. When the trust ends, the titles coalesce. The holder of the equitable title then becomes the absolute owner of the estate. It is his title that has been increased by the merger, and not his property. He is worth no more money than before, but he has become the absolute owner of that in which he before had only the beneficial interest. A corporation is an artificial person created by law for the purpose of becoming the business representative, agent, or trustee of so many persons as may join to furnish the money with which the business to be done by the corporation may be carried on. The corporation comes into existence like a natural per-son—naked. The money furnished by those whose representative it is to be is its capital stock. The amount that each person contributes to this fund is his share in the venture, and is called his share or shares in the stock. The legal title to the whole sum so contributed is in the corporation, and so is the legal title to all the property, real or personal, in which it may be invested. The equitable title—that is, the rights to the profits from the business done, as to a return of the capital when the corporation is dissolved—is in the stock-holders. There is one estate, one business, but the title has been divided by the separation of the power of control from the right to receive the profits. The nature of the undertaking, or the number of the persons uniting in it, makes this division desirable for convenience in the transaction of the business, and for the unity and efficiency of its management. Nevertheless, as in the ordinary case of trustee and cestui que trust, the real owners are the beneficiaries.

Counsel contends, also, that "the sequence in priorities of the creditor, whether by direct or contingent liability, as distinguished from that of the stockholder in a given company is so well settled that it would be superfluous to cite authorities on that point." He does, however, cite *Northern Pacific R. R. Co. v. Boyd*, 228 U. S. 482, and argues therefrom that, inasmuch as the Commissioner recognized and allowed the loss incurred in the sale of the stock of the Union Publishing Co., he can not "disallow a loss as creditor of the same company resulting from payment of liability, originally contingent but which became fixed on or before December 31, 1923." The question of the "sale" of stock is not before us in the issues raised. Under the circumstances as disclosed by the record before us, we believe that the Commissioner was very generous in allowing as deductible the loss on the sale of stock.

Counsel for these two petitioners do not appear to be altogether in harmony regarding the purpose for which the Union Publishing Co. was created. The attorneys for the Press Publishing Co. assert that in their case there is no suggestion of an attempt to evade taxation, and that there is no indication that the subject was in the minds of the parties when the transaction occurred; while the contention of the representative of the Newspaper Printing Co. seems to contain a tacit admission of such a purpose in his statement that his client followed each and every step of the strict letter of the law giving a right to deduct a fixed, known, ascertained loss in the year 1923. But that is not important. Both the courts and this Board will sustain all legal acts that result in an avoidance of taxation; but we have repeatedly declared our duty to look to the substance of every transaction; and so, looking here through the diaphanous veil held before the facts, we sustain the Commissioner in every respect.

Reviewed by the Board.

*Judgment will be entered for the respondent.*