## NEWSPAPER PRINTING CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4465.

Circuit Court of Appeals, Third Circuit.
Feb. 5, 1932.

Henry Oliver Evans and Oliver Evans, both of Pittsburgh, Pa., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and John H. McEvers and Sewall Key, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and De Witt M. Evans, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before DAVIS, Circuit Judge, and THOMSON, and WATSON, District Judges.

THOMSON, District Judge.

The facts of this case are entirely clear, and the conclusion which should be reached is largely one of law.

Prior to January, 1923, there were five competing publishing companies in Pittsburgh: the Newspaper Printing Company, the Press Publishing Company, the Post Publishing Company, the Dispatch Publishing Company, and the Leader Publishing Company. The three first might be designated as taxpayers, the latter as competitors. It being the opinion of the taxpayers that there were more newspapers in the city than the revenues justified, they decided to purchase the business and assets of the Dispatch and Leader, which we name as competitors. To accomplish this end, the three first named companies organized the Union Publishing Company, a corporation of the state of Delaware, with a capital stock of $20,000, of which each of the three named companies subscribed to one-third. The Union Publishing Company then issued bonds in the sum of $1,590,000, each of the three subscribers to its stock guaranteeing the payment of $530,000 of these bonds.

On February 13, 1923, the Union Publishing Company bought out the competitors, except cash and accounts receivable, and immediately discontinued the publication of the papers so acquired. The company then proceeded to liquidate the tangible assets, the money procured thereby being applied to its borrowed indebtedness. On December 31, 1923, the company transferred the remaining assets to its creditors, the value being applied on its borrowed indebtedness, which left a balance of $1,315,390.48 unpaid, for which each of the three above named companies was liable as a guarantor to the extent of one-third. The petitioner, the Newspaper Printing Company, deducted this one-third, or $438,460.14, from gross income in its tax return for 1923, as a fixed accrued liability as of December, 1923. This claim was disallowed by the Commissioner, and his action was affirmed by the Board of Tax Appeals. From this action, the present appeal was taken.

In determining the question before the court, there are certain admitted facts, which seem to us, not only material, but vital. The purpose and object of the plan is conceded. E. R. Stowl, manager of the Union Publishing Company testified (R. 53): "The object of the Union Publishing Company was simply to dispense with these two newspapers on the theory that there were more newspapers in the town than could live from the income which was derived from possible newspaper earnings."

In the stipulated facts (R. 50) it is stated: "The purpose of said Newspaper Printing Company, Press Publishing Company, and Post Publishing Company in causing said Union Publishing Company to be created was to provide an agency by means of which the papers known as the Leader and the Dispatch could be purchased and the publications of those papers discontinued."

Thus there can be no question that the Union Publishing Company was the mere agent for the carrying out of the plan of purchase and eliminating from competition the Dispatch and Leader. The plan was duly considered by the interested parties as beneficial to the petitioner. This is shown by the resolution of the directors of that body at a meeting held on February 13, 1923, authorizing the company to guarantee the bonds. The material part of the resolution is as fol-

lows: "Whereas the purchase of the property and assets of the Dispatch Publishing Company and the Leader Publishing Company by the Union Publishing Company will enure greatly to the benefit of the business of this Company and also will benefit it as a stockholder of the Union Publishing Company."

The new company was formed in February, 1923. It had no assets or business of its own. On February 13th, the petitioner authorized the guaranteeing of the bonds, and on the same day, the two newspapers were purchased and publication discontinued. These facts conclusively indicate that the purchase price, the discontinuing of publication, the issuance of bonds, etc., were agreed upon in advance, and simultaneously executed and carried out.

In applying taxing statutes, courts must look to the substance, rather than the form, of a transaction. United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180; McCaskill Co. v. United States, 216 U. S. 504, 30 S. Ct. 386, 54 L. Ed. 590; and many other cases which might be cited.

The companies who formed the Union Publishing Company, looking over the field, decided that it was wise and worth the cost, to buy out and discontinue the business of the competitors. To accomplish this end, the Union Publishing Company was created as their agent. This agency accomplished the desired object at a cost of $1,315,390.48, plus the amount of capital stock of $20,000. Acting merely as the agent to carry out the transaction, the acts of the agent clearly became the acts of the principals. Thus the cost to the agent of eliminating the undesirable competition was in fact the cost to the principal. While the system may be considered somewhat involved, it is easily understood. Ultimately, the cost fell where it properly belonged—upon the principals. The simple question then arises whether the cost of eliminating competition can constitute a loss within the meaning of section 234 (a) (4) of the Revenue Act of 1921 (42 Stat. 255); or whether the value of the thing procured, that is, the elimination of competition, is a capital asset to be carried to capital account. That the cost of eliminating competition is a capital asset has been established by a long line of decisions of the Board of Tax Appeals. In this case it appears to be clear that the taxpayer was willing to pay the amount of its claimed loss for the benefits to be derived from the elimination of the two competitors. The value of this intangible asset, which must be presumed to be measured by its cost, should have been credited to the capital account and carried as a capital asset. The fact that business men, perhaps of wide experience, were willing to pay out the money in return for the gain, clearly negatives any idea that they contemplated that the gain would be less than the expenditure.

In this case, there were purchased both the tangible assets and the good will, while the tangible assets only were sold. What the taxpayer here considered a loss is represented by the good will, which he did not sell and now has.

To us, it is therefore clear that the taxpayer did not sustain a loss within the meaning of section 234 (a) (4) of the Revenue Act of 1921; that the expenditure was neither an ordinary or a necessary expense in carrying on the taxpayers' business. Section 234 (a) (1).

We therefore affirm the decision of the Board of Tax Appeals.