**DICKEY et al. v. BURNET, Commissioner of Internal Revenue.**

No. 8963.

Circuit Court of Appeals, Eighth Circuit.

March 2, 1932.

Rehearing Denied April 22, 1932.

Maurice H. Winger and Alton Gumbiner, both of Kansas City, Mo. (Winger, Reeder, Barker, Gumbiner & Hazard, of Kansas City, Mo., on the brief), for petitioners.

John G. Remey, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Dean P. Kimball, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and SANBORN, District Judge (since appointed Circuit Judge).

SANBORN, Circuit Judge.

The executors of the last will and testament of Walter S. Dickey, deceased, petition for a review of an order of the Board of Tax Appeals determining deficiencies in the individual income taxes of Mr. Dickey for the years 1920 and 1921 of $167,285.10 and $97,669.27, respectively.

In 1917, Mr. Dickey, who resided in Kansas City, Mo., was a man of large means and varied business interests. He was engaged, among other things, in the manufacture of clay products, and owned many plants and factories in various parts of the United States which produced such products, and the clay lands from which the necessary raw material was obtained. Among the corporations the stock of which was owned by him was the Ontario Realty Company, a Missouri corporation. This company, prior to January 10, 1917, owned valuable real estate, and its entire capital stock belonged to Mr. Dickey, with the exception of two shares, one of which stood in the name of Fred L. Dickey, a brother, and the other in the name of George H. Davis, the secretary of the company. The board of directors consisted of Mr. Dickey and these two other stockholders.

On January 10, 1917, a contract was entered into between Mr. Dickey and the Ontario Realty Company, by the terms of which Mr. Dickey sold to that company approximately 3,000 acres of clay land for a consideration of $335,507.28 and its agreement "to pay two-thirds of the gross income from said lands to Kate L. Dickey, Madeline A. Dickey, Catherine Dickey, and William Laurence Dickey in equal shares during their lifetime, and on the death of any one or more of said parties the share of such gross income payable to such deceased person or persons to be paid to W. S. Dickey, or on his order, such payments to continue until the clay deposits on said lands shall be exhausted." Kate L. Dickey was the wife of Walter S. Dickey, and the other individual beneficiaries of the sales contract were his children. The lands were those upon which fifteen of Mr. Dickey's clay plants were dependent for their raw material. The $335,507.28 specified in the sale contract was the March 1, 1913, value of the land, and that value was fixed in order to avoid any taxable profit.

Subsequent to January 10, 1917, an oral agreement was made between Mr. Dickey and the Ontario Realty Company whereby he was to pay $1 a ton burned weight for the clay taken by him from the lands. The Board of Tax Appeals found that this agreement be

came effective as of January 1, 1917, and was to continue from year to year unless terminated by mutual agreement, and that the royalty to be paid was subject to change from time to time as conditions justified. Mr. Dickey removed the clay for his plants from the lands as he needed it, and bore the entire expense of such removal, and controlled the means by which the clay was removed. The $335,507.28 specified in the sale contract was not paid in cash, but a charge of that amount was entered against the Ontario Realty Company upon Mr. Dickey's books, and this amount was liquidated during the following three years out of credits entered upon his books to the realty company for clay taken from the lands by Mr. Dickey. Separate books of account were kept for the realty company. It had, however, no separate bank account. Mr. Dickey acted as its banker and as banker for members of his family. On his books were kept accurate accounts of all advances, disbursements, and collections made, for the realty company and also for each member of his family. His wife and children drew against his bank account, and their checks were charged to their own personal accounts upon his books.

Quarterly, the amounts due the realty company for clay taken by Mr. Dickey under his oral agreement were computed. The realty company received credit for one-third of such amounts, and the other two-thirds was credited to the beneficiaries of the sale contract pro-rata. Mrs. Dickey died September 13, 1920. Thereafter, what would have been her share of the gross profits of the realty company from the sale of clay was credited to Mr. Dickey. From 1917 to 1923, one-third of the gross profits credited to the realty company from the sale of clay was $727,324.08, and there was credited to the beneficiaries $1,454,649.68 for the same period. The credits to the beneficiaries for 1920 were $223,621.97; for 1921, $175,554.90; for 1922, $161,215.74; for 1923, $120,965.79; or a total for the four years of $681,358.40. The amounts thus credited to them were reported as income by them in their individual returns as "Royalties from Ontario Realty Co.," and they paid income taxes upon them. Mr. Dickey, in his returns for those years, deducted from his gross income all amounts credited to the Ontario Realty Company and to the beneficiaries on account of clay taken by him from these clay lands. Upon the audit of Mr. Dickey's income tax returns for those years, the Commissioner of Internal Revenue added to the net income reported by Mr. Dickey the amounts credited to the beneficiaries, upon the ground that they represented gifts of income by Mr. Dickey to them in those years. To adjust the matter of taxes which had been paid upon the same income by the beneficiaries, the Commissioner, so far as possible, issued certificates of overassessment.

From the determination by the Commissioner of a tax deficiency resulting from his adding to Mr. Dickey's income the amounts credited to the beneficiaries, Mr. Dickey appealed to the Board of Tax Appeals. The Board made its findings and reached the conclusion that Mr. Dickey was not entitled to deduct from his income the credits entered upon his books in favor of his wife and children and which had been reported by them as "Royalties from the Ontario Realty Co.," because they were not ordinary and necessary expenses deductible from gross income; this, apparently upon the theory that $1 a ton for clay was an excessive price. The petitioners complain of the reasons given by the Board as the basis of its decision, and also of its findings with respect to the reasonable value of clay. It is, however, of no importance what reasons the Board gives for its decision if the decision is correct. Hughes v. Commissioner (C. C. A.) 38 F.(2d) 755.

The petitioners assert that the contract whereby these clay lands were sold to the realty company was a closed transaction in 1917; that the title to the lands then passed, the cash consideration was paid, and the value of the unpaid part of the purchase price, being the two-thirds of the gross future income from the lands to be paid to the wife and children of Mr. Dickey, was capable of being definitely ascertained and reduced to a present cash value, and that, as a result of the transaction, a definite present interest was vested in the beneficiaries by the sale, and that whatever moneys they received thereafter resulted from a vested contract right and were not gifts of future income.

It is also urged by the petitioners that the oral agreement between Mr. Dickey and the realty company for the purchase of clay did not leave in Mr. Dickey any right to change the price or to terminate the agreement, and that he could have been compelled to take clay at $1 a ton until the clay deposits were exhausted.

The only testimony in the record with reference to this oral agreement is that of Mr. Michaelson, Mr. Dickey's general auditor, and of Mr. Dickey himself. Mr. Michaelson's testimony showed that, at the time he testified,

he was secretary and treasurer of the Ontario Realty Company, of which Mr. Dickey was then president; that in 1917 he was familiar with the records and transactions of that company, although he was not then secretary, but was assistant secretary. He did not say that he was present at the time the oral contract was made, but testified: "There was an agreement on the part of Mr. Dickey to pay to the Ontario Realty Company for all clay removed from these lands at the price of $1.00 per ton burned weight, and the agreement was to continue until the clay deposit was exhausted, which agreement is recited in the minutes." He further said: "Mr. Dickey's agreement to pay $1.00 a ton was an oral agreement, the term of which was until the clay deposits were exhausted. The last sheet of this Form F is the yellow sheet and is in my handwriting. The statement upon that yellow sheet as follows:—'This agreement became effective January 1st, 1917, and continues from year to year until terminated by mutual agreement. The royalty paid is subject to change from time to time, as conditions justify. The operator and lessee has the right to enter upon the company's lands for the purpose of opening up clay deposits, or make use of clay pits already opened, and to extract and transport therefrom clay for the use of his plants. The operator furnishes all equipment and tools, including tracks, steam shovels, etc., and bears all the expense of stripping overburden, excavating, leading and transporting the clay.'—is not exactly correct. It is correct in reference to the Ontario Realty Company in connection with its depletion determination." In referring to form F, Mr. Michaelson was speaking of "Schedules for substantiation of valuation, depletion, and depreciation," transmitted to the Commissioner of Internal Revenue on July 21, 1923, for Ontario Realty Company and Walter S. Dickey. Mr. Dickey testified: "I agreed to pay to the Ontario Realty Company for the clay taken from these lands $1.00 per ton burned weight, and I did pay that amount from January, 1917, during all of the time up to and including 1920, 1921, 1922 and 1923, which are now in controversy. There was no arrangement about changing the price at any time." And further: "The agreement to pay $1.00 per ton burned weight for this clay was not reduced to writing. I made it with this Ontario Realty Company and its officers and directors, of which I was one. In entering into this agreement to pay $1.00 per ton we just simply reached that conclusion and agreed upon it. I could not quote the exact words. I made the proposition to the officers of the corporation. I was one of the officers and chief stockholder, but I did not vote on this proposition. I purposely did not vote because of my large interest in the corporation. At the time this oral agreement to pay $1.00 per ton burned weight for the clay was made, as to what was said by the Ontario Realty Company or any of its agents and what was said by me, I do not know that there was anything said except that I would take the clay and pay $1.00 a ton for it. In making this statement I was talking to the directors of the Ontario Realty Company and the officers of it. There was no written agreement covering the $1.00 per ton agreement."

·The memorandum of the oral contract furnished the Commissioner by Mr. Michaelson for the Ontario Realty Company and Mr. Dickey with the letter of July 21, 1923, signed by the Ontario Realty Company, transmitting form F, was evidence of the terms of the oral contract in question, and we think the Board of Tax Appeals was justified in finding that the contract was subject to termination by mutual consent, and that the price of clay was subject to variation.

We think that the exact terms of the oral contract are not of great importance, because Mr. Dickey controlled the realty company through stock ownership, and it is obvious that the contract was subject to termination and modification by mutual assent, if not otherwise; and such assent would readily be forthcoming. Furthermore, the beneficiaries of the contract of sale were not parties to the oral contract for the purchase of clay and had no means of enforcing it.

The contention that the value of the promise of the Ontario Realty Company to pay the beneficiaries two-thirds of its gross income from the sale of clay could be definitely ascertained, is answered by the case of Burnet v. Logan, 283 U. S. 404, 51 S. Ct. 550, 75 L. Ed. 1143; which involved the purchase of 12% of the stock of a company which controlled and operated an iron mine. The purchaser obtained the right to receive the same percentage of the ore removed from the mine. The consideration was a sum in cash and an agreement to pay 60 cents a ton for ore apportioned to the purchaser. The court said (page 413 of 283 U. S., 51 S. Ct. 550, 552): "When the profit, if any, is actually realized, the taxpayer will be required to respond. * * * The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one."

We are convinced that Mr. Dickey, while he parted with the title to the clay lands by selling them to the realty company, did not, as a practical matter, part with his command over the income to be derived from those lands. Controlling, as he did, the price and amount of clay to be taken from them, and the stock of the realty company, as well as the means of removing the clay and producing the finished products, he had it in his power to regulate the amount of gross income which the realty company would obtain from the sale of clay and the amount of income which, would pass to his wife and children under the sales agreement. In effect, he controlled the benefits to be derived from the use of these clay lands just as fully after the transfer of title as he did before.

The fact is, of course, that Mr. Dickey adopted this method of transferring to his wife and children such portion of his income as he wished them to have. Had he contracted directly with them to credit them each year pro rata with 66⅔ cents for every ton of clay that the fifteen plants used, the result would have been the same, and his control over his income would have been no different.

We do not question Mr. Dickey's right to reduce the amount of his income tax by giving away the property which produced the income or by any other legally effective method, but we think that the method which he adopted did not have the effect claimed for it.

In the case of Corliss v. Bowers, 281 U. S. 376, 50 S. Ct. 336, 74 L. Ed. 916, it appeared that Corliss had transferred the fund, out of which the income upon which he was taxed arose, to trustees, in trust, to pay the income to his wife for life, with remainder over to their children. He reserved the right to modify, alter, or revoke the trust agreement. The net income from the property was paid over to the wife, and he argued that the income never was his, and that he could not be taxed for it; that the legal estate was in the trustees and the equitable interest in his wife. The Supreme Court said (page 378 of 281 U. S., 50 S. Ct. 336): "But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid. If a man directed his bank to pay over income as received to a servant or friend, until further orders, no one would doubt that he could be taxed upon the amounts so paid. It is answered that in that case he would have a title, whereas here he did not. But from the point of view of taxation there would be no difference. The title

would merely mean a right to stop the payment before it took place. The same right existed here although it is not called a title but is called a power. The acquisition by the wife of the income became complete only when the plaintiff failed to exercise the power that he reserved. Saltonstall v. Saltonstall, 276 U. S. 260, 271, 48 S. Ct. 225, 72 L. Ed. 565; Chase National Bank v. United States, 278 U. S. 327, 49 S. Ct. 126, 73 L. Ed. 405, 63 A. L. R. 388; Reinecke v. Northern Trust Co., 278 U. S. 339, 49 S. Ct. 123, 73 L. Ed. 410, 66 A. L. R. 397. Still speaking with reference to taxation, if a man disposes of a fund in such a way that another is allowed to enjoy the income which it is in the power of the first to appropriate it does not matter whether the permission is given by assent or by failure to express dissent. The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not."

The Corliss Case involved the question of the constitutionality of § 219 (g) and (h) of the Revenue Act of 1924 (U. S. C. tit. 26, § 960 [26 USCA § 960 note]) relating to the taxability of the income from the corpus of a trust where the power of revocation was reserved, but the language used is appropriate here, and we agree with the Circuit Court of Appeals of the Fifth Circuit that the provision of the act involved in that case was merely declaratory of existing law. See McCauley v. Commissioner (C. C. A. 5) 44 F.(2d) 919.

The case of Lucas v. Earl, 281 U. S. 111, 50 S. Ct. 241, 74 L. Ed. 731, presents this situation: Earl and his wife agreed that all moneys and properties received by them should be held by them as joint tenants, and the question was whether, in view of that agreement, Earl could be taxed for the whole of his salary and attorney's fees earned by him in the years 1920 and 1921, or should be taxed for only half of them. The court said (page 114 of 281 U. S., 50 S. Ct. 241): "A very forcible argument is presented to the effect that the statute seeks to tax only income beneficially received, and that taking the question more technically the salary and fees became the joint property of Earl and his wife on the very first instant on which they were received. We well might hesitate upon the latter proposition, because however the matter might stand between husband and wife he was the only party to the contracts by which the salary and fees were earned, and it is somewhat hard to say that the last step in the performance of those contracts could be taken

by anyone but himself alone. But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory. arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew." See, also, Wehe v. McLaughlin (C. C. A.) 30 F.(2d) 217; Belcher v. Lucas (C. C. A.) 39 F.(2d) 74; Leydig v. Commissioner (C. C. A.) 43 F.(2d) 494; McCauley v. Commissioner, supra; Bing v. Bowers (D. C.) 22 F.(2d) 450 [affirmed (C. C. A.) 26 F.(2d) 1017]; Mitchel v. Bowers (C. C. A.) 15 F.(2d) 287; Rosenwald v. Commissioner (C. C. A.) 33 F.(2d) 423.

We have reached the conclusion that the method employed by Mr. Dickey of providing for his wife and children out of his future income was "an anticipatory arrangement," and that his control over the income to be derived from the clay lands transferred to the realty company prevented him from attributing that portion of it which was credited to his wife and children, under the terms of the contract of sale, to them for the purposes of taxation.

The petition to review is denied.