FLORIDA PUBLISHING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6986-70.    Filed May 22, 1975.

*Kenneth G. Anderson, Fred M. Cone, Jr., Hugh F. Culverhouse,* and *Dennis J. Lanahan, Jr.,* for the petitioner.
*Donald W. Williamson, Jr.,* for the respondent.

GOFFE, *Judge:* The Commissioner determined a $412,304.87 deficiency in petitioner's Federal income tax for the taxable year 1966. Certain adjustments made in the statutory notice of deficiency were not raised by the petitioner. The only issue before the Court is whether the petitioner may currently deduct under section 173, 165, or 162[1] any part of the consideration paid to acquire the circulation and all other tangible and intangible assets of a competing newspaper business as a going concern.

#### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference.

Petitioner Florida Publishing Co. (Florida Publishing) is a Florida corporation organized in 1888. Its principal place of

---

[1] Unless otherwise noted, all Code section references are to the Internal Revenue Code of 1954 in effect during the taxable year in issue.

business and office at the time it filed the petition in this case, and at all times pertinent hereto, was at Jacksonville, Fla. Petitioner filed its Federal income tax return for 1966 with the District Director of Internal Revenue, Jacksonville, Fla.

Since the late 1880's, petitioner has been engaged in the newspaper business. Prior to 1959, it published a daily morning edition and a Sunday edition of the Florida Times Union (the Times Union). About 1959, petitioner purchased a Jacksonville daily evening newspaper published under the name Jacksonville Journal (the Journal), and since that time, petitioner has published a morning and evening newspaper and a Sunday newspaper, the Florida Times Union-Jacksonville Journal. The Times Union has been published since 1866, the Journal since 1887.

Prior to the 1960's, Florida was, and still is, one of the fastest growing areas in the United States. Commencing in the late 1950's or early 1960's, newspaper groups located outside Florida were actively seeking and acquiring Florida-based newspapers in order to reach Florida's potential market. Without an established circulation structure, it was very difficult for an outside publisher to move into an area, establish, and successfully operate an entirely new newspaper. It was much easier to acquire the circulation of an existing newspaper and then gradually upgrade and expand its circulation. Thus, a seller's market existed in Florida during all times relevant.

The larger newspaper chains or groups brought to Florida improved technological and mechanical advantages, such as offset type, computerized typesetting, and better use of color, as well as editorial knowledge, sales aggressiveness, and financial backing. Florida Publishing and other newspapers had to compete with such improved newspaper products.

Since Florida Publishing was in a good position to improve its plant and its product, the ability to offer an improved product was not limited to outside groups. If competition moved to update and improve their facilities and product, Florida Publishing normally did likewise. Also, when a newspaper in its circulation area offered a new type of aggressive competition, Florida Publishing became more aggressive.

Although Florida Publishing was concerned about competition moving into its circulation area, it is not unusual in the newspaper business for circulation areas to overlap or for a

new competitor to move into an established circulation area of another paper. Thus, circulation areas of local weeklies, local dailies, metropolitan, regional, national news media, shoppers' papers, and other type news media may overlap.

Petitioner's circulation has always been primarily located in Duval County and the northeast section of Florida. Its total net paid circulation has fluctuated over the years. In years after 1960, petitioner began to suffer a decline in its average net paid circulation. With respect to the Times Union (morning newspaper), its circulation in Jacksonville and Duval County declined from 102,817 in 1960 to 97,650 in 1966. Petitioner's average net paid circulation in areas outside Jacksonville and Duval County declined from 66,161 in 1960 to 51,394 in 1966. The Times Union circulation in areas outside Jacksonville and Duval County continued to decline after 1966. With respect to the Journal (evening newspaper), Jacksonville and Duval County circulation declined from 48,319 in 1960 to 45,953 in 1966. During the same period, the circulation of the Journal in areas outside Jacksonville and Duval County increased from 4,529 in 1960 to 6,907 in 1966. On a combined daily and Sunday basis, the average net paid circulation for the Times Union and Journal as audited by the Audit Bureau of Circulation for the years 1960 through 1966 was as follows:

| Year | Combined daily | Sunday |
|------|----------------|--------|
| 1960 | 221,826 | 171,977 |
| 1961 | 196,816 | 152,984 |
| 1962 | 203,097 | 163,164 |
| 1963 | 202,473 | 166,928 |
| 1964 | 198,620 | 166,435 |
| 1965 | 199,174 | 169,879 |
| 1966 | 201,904 | 171,057 |

Petitioner was having a major problem maintaining its circulation outside Duval County and especially in west Florida and south Georgia. This had been due primarily to the improved product and aggressiveness of competitors in the outlying areas as well as the additional costs of producing and delivering its newspapers to those areas.

The management and directors of petitioner had for several years prior to July 1, 1966, discussed the possible purchase of neighboring newspapers (including the St. Augustine Record) for additional revenue and for long-range protection of its circulation

and advertising sales. Prior to acquisition of the St. Augustine Record (the Record), the management and directors of petitioner knew the purchase price would be high because of the market for such small newspapers being generated by outside chains, groups, and other competitors. Nevertheless, by acquiring the Record's entire business, petitioner acquired the Record's circulation which, in turn, provided maintenance and protection of petitioner's circulation from possible outside competition. Without the benefit of the Record's circulation structure, an outside publisher normally would not be able to come into the St. Augustine area and compete with petitioner or otherwise establish a base of operations in the area. Thus, by effectively eliminating competition in the St. Augustine area, acquisition of the Record gave petitioner a benefit lasting at least as long as it maintained ownership and control of that business.

For many years prior to 1966, the Tebault family of St. Augustine, St. Johns County, Fla., published the St. Augustine Record. This newspaper business was incorporated in 1961 and conducted by the Tebaults from 1961 to July 1966 in a Florida corporation, the St. Augustine Record, Inc. (also sometimes referred to as the Record). Publication of the Record commenced in 1894.

Prior to June 22, 1966, petitioner's management had a general knowledge of the circulation, equipment, and income of the Record. After discovering in May or June of 1966 that a third party was negotiating for the purchase of the Record, the management and directors of petitioner decided to meet or beat the offer made by the third party to acquire the Record. On July 6, 1966, petitioner purchased, as of July 1, 1966, all of the assets and business of the St. Augustine Record, Inc., including the machinery, circulation, routes, goodwill, and all other tangible and intangible things necessary and useful in connection with the Record's newspaper business. In addition, the purchase agreement provided that Elizabeth B. Tebault, A. H. Tebault, and Elizabeth Tebault Olson, the sole officers, directors, and shareholders of the St. Augustine Record, Inc., would not, for a period of 5 years from the date of purchase, compete in any manner in St. Johns County with petitioner or any subsidiary of petitioner. For the Record's newspaper business, the petitioner paid a total consideration of $1,590,956.52 consisting of $1,500,000 in cash and the petitioner's assumption of $90,956.52

in liabilities of the selling corporation. The $1,500,000 cash payment consisted of a binder fee of $50,000 paid to the Tebaults on June 22, 1966, and $1,450,000 paid at closing on July 6, 1966. The liabilities assumed by petitioner as of July 1, 1966, were as follows:

| | |
|---|---:|
| Prepaid subscriptions | $3,962.28 |
| Accounts payable | 12,044.06 |
| Payroll taxes payable | 3,810.01 |
| Accrued property tax | 1,140.17 |
| Mortgage payable—Frank Harrold | 70,000.00 |
| Total liabilities assumed | 90,956.52 |

The St. Augustine Record, Inc., was dissolved after the sale of its newspaper business and the assets were distributed to its stockholders.

From July 1 until December 31, 1966, the business of the Record was conducted as a division of petitioner. A new corporation, St. Augustine Record, Inc., was organized by petitioner under the laws of Florida on July 14, 1966, but remained inactive until January 1, 1967. On January 1, 1967, in exchange for 5 shares of stock (representing all of the outstanding stock of the new corporation at all times relevant), petitioner transferred the assets and business of the Record to the new corporation which assumed certain liabilities of the business. As of January 1, 1967, the balance sheet of the new corporation after the transfer to it by petitioner of the assets of the Record reflected the following:

### Assets

| | |
|---|---:|
| Cash | $7,135.52 |
| Receivables | 74,303.21 |
| Inventory | 8,248.78 |
| Other assets | 1,301.46 |
| Depreciable assets | 214,764.16 |
| Reserve for depreciation | (15,392.11) |
| Land | 22,564.28 |
| Intangible assets | 450,000.00 |
| | 762,925.30 |

### Liabilities and capital

| | |
|---|---:|
| Accounts payable | 15,452.07 |
| Other liabilities | 3,906.29 |
| Notes and mortgages | 594,011.04 |
| Capital stock | 150,000.00 |
| Retained earnings | (444.10) |
| | 762,925.30 |

Prior to the transfer of the assets and business of the Record to the new subsidiary corporation, the petitioner allocated part of the purchase price of the Record to the tangible assets acquired on July 6, 1966, as follows:

| | |
|---|---:|
| Petty cash | $150.00 |
| Cash on hand: | |
| St. Augustine National Bank: | |
| Payroll account | 671.69 |
| General account | 6,225.39 |
| Cash value—life insurance | 1,282.27 |
| Accounts receivable: | |
| Classified | 2,304.84 |
| Local and legal | 28,236.73 |
| Clay crescent | 216.00 |
| National | 1,184.63 |
| Equipment and Supplies: | |
| Newsprint | 2,247.48 |
| Ink | 37.00 |
| Mats | 348.00 |
| Equipment | 149,994.05 |
| Auto and trucks | 8,100.00 |
| Prepaid insurance | 1,000.00 |
| Utility deposits | 10.00 |
| Land | 22,564.28 |
| Buildings | 57,415.51 |
| | 281,988.06 |

Petitioner allocated $450,000 of the purchase price to the circulation structure of the Record as of July 1, 1966. The $858,968.46 balance of the $1,590,956.52 paid for the Record was allocated to an account called "expense of maintaining circulation" and deducted by the petitioner on its 1966 Federal income tax return. No part of the purchase price was allocated to the covenant not to compete or any other intangible asset, benefit, or advantage acquired by petitioner.

In the statutory notice of deficiency, the Commissioner disallowed the $858,968.46 deduction claimed by petitioner with the following explanation:

It is determined that the deduction of $858,968.46 claimed in cost of goods sold as an expense of maintaining circulation is not allowable either under section 162 or section 173 of the Internal Revenue Code. Therefore, your taxable income is increased in the amount of $858,968.46.

Two other adjustments in the statutory notice were not placed in issue by petitioner.

ULTIMATE FINDINGS OF FACT

Without either party being under compulsion to buy or sell and with reasonable knowledge of all the relevant facts, petitioner purchased the entire business of the Record from the Tebaults for $1,590,956.52 in arm's-length negotiations and competitive bidding. Petitioner purchased the Record to acquire its circulation and thereby effectively eliminate potential competition. The purchase of the Record was a capital transaction securing the petitioner benefits lasting at least as long as petitioner owns and controls the Record. No portion of the purchase price paid for the Record is deductible under section 173, 165, or 162.

OPINION

The issue is whether the petitioner may currently deduct under section 173, 165, or 162 any part of the consideration paid to acquire the circulation and all other tangible and intangible assets of a competing newspaper business as a going concern. The facts relevant to our determination of this issue are set out in the findings of fact.

Petitioner argues that it purchased the St. Augustine Record newspaper business to protect and maintain its own circulation and revenue from potential outside competition, and not to acquire the Record as an investment, per se. Petitioner further contends that it paid a premium for the Record and that the excess of the purchase price over the alleged fair market value of the Record in July 1966 is fully deductible in 1966 as an expense of maintaining circulation under section 173 or 162, or as a loss under section 165.

Respondent argues that without either party being under compulsion to buy or sell and with reasonable knowledge of all the relevant facts, petitioner purchased the Record for $1,590,956.52 in arm's-length negotiations and competitive bidding in order to acquire the Record's circulation and thereby effectively eliminate potential competition. While it does not contest petitioner's allocation of $281,988.06 of the purchase price to tangible assets of the Record and $450,000 to the

circulation structure of the Record, respondent contends that the $858,968.46 balance must be allocated to the intangible assets, benefits, and advantages acquired which will last at least as long as petitioner owns and controls the Record and thus must be capitalized under section 263 regardless of the fair market value of those intangibles. Accordingly, respondent concludes that no part of the purchase price of the Record is deductible as an expenditure to maintain circulation within the meaning of section 173 or under section 162, and that section 165 is not applicable because petitioner did not realize a loss in 1966 evidenced by a closed and completed transaction or fixed by identifiable events. For the reasons discussed below, we agree with respondent.

Section 173, originally enacted into law as section 23(bb) of the Internal Revenue Code of 1939 by the Revenue Act of 1950, 68A Stat. 65-66, provides in relevant part as follows:

> Notwithstanding section 263, all expenditures (other than expenditures for the purchase of land or depreciable property or for the acquisition of circulation through the purchase of any part of the business of another publisher of a newspaper * * *) to establish, maintain, or increase the circulation of a newspaper * * * shall be allowed as a deduction; * * *

The original bill provided that a deduction would not be allowed for any part of expenditures for the acquisition of circulation "through the purchase of newspapers, magazines, or other periodicals." See S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 529. This language was changed in the 1954 Code to the present wording by an amendment in the Senate. However, Congress intended to carry over the substance of section 23(bb) of the 1939 Code into section 173 of the 1954 Code. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 214 (1954).

The Senate Report accompanying the Revenue Act of 1950 reads in relevant part as follows:

> Under the bill, publishers of newspapers, magazines, or other periodicals are allowed to deduct as ordinary expenses expenditures to maintain, establish, or increase circulation, except expenditures for the purchase of land or depreciable property or for the acquisition of circulation through the purchase of other periodicals. *This follows, in general, the practice of existing law although in some instances expenditures to increase and establish circulation have been required to be capitalized. The bill removes any uncertainty by permitting all such expenditures to be taken as deductions.* * * * [Emphasis added. S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 529.]

See also H. Rept. No. 3124, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 583. As further explained by the sponsors of the bill on the floor of both Houses:

This will eliminate the problem of distinguishing between the cost of maintaining circulation and the cost of establishing or developing [increasing] circulation. * * * [96 Cong. Rec. 13276, 15586 (1950).]

The case law (referred to in the above-quoted legislative history) existing at the time of the enactment of the predecessor of section 173 is succinctly summarized in *Perkins Bros. Co. v. Commissioner*, 78 F. 2d 152, 154-155 (8th Cir. 1935), as follows:

We have held that the circulation of a newspaper is an intangible capital asset, and that money expended in increasing it is a capital expenditure, and not deductible as an expense of carrying on the business [Meredith Pub. Co. v. Commissioner, 64 F. (2d) 890, 891; Public Opinion Pub. Co. v. Jensen, 76 F. (2d) 494, 496]; but where the expenditure is for the purpose of maintaining a circulation structure, then it is deductible as an ordinary and necessary expense, and these cases are clearly distinguishable from the instant case. *The expenditures considered in the above-cited cases were for campaigns, drives, or contests carried on for the express purpose of increasing the circulation list,* and as a result of which the circulation was tremendously increased. Here, it appears without dispute, that petitioner did not do this in 1928 and 1929, but carried on only the normal business of soliciting subscriptions for the purpose of keeping up the circulation structure which it had already built up and established to the normal or saturation point. * * * We must bear in mind that we are here considering the character of an expenditure, and that is dependent upon its general purpose rather than upon an incidental result. [Emphasis added.]

Thus, our examination of the case law reveals that the uncertainty to which the legislative history referred involved distinctions made between routine, normal expenditures to renew or maintain existing circulation on the one hand and expenditures to establish or increase circulation on the other. All of the expenditures in the prior cases were in the nature of customer solicitation such as salaries of telephone solicitors, expenses of premiums and prizes used in circulation contests, and the like. *Perkins Bros. Co. v. Commissioner, supra* (subscription solicitors); *Public Opinion Pub. Co. v. Jensen*, 76 F.2d 494 (8th Cir. 1935), approving *Public Opinion Publishing Co.*, 6 B.T.A. 1255 (1927) (solicitors' salaries and prizes); *Journal of Living Publishing Corp.*, 3 T.C. 1058 (1944) (mail solicitation costs); *Successful Farming Pub. Co.*, 23 B.T.A. 150 (1931), affd. sub nom. *Meredith Publishing Co. v. Commissioner*, 64 F.2d 890, 893 (8th Cir. 1933), cert. denied 290 U.S. 646 (1933)

(circulation contest); *Walter S. Dickey,* 14 B.T.A. 1295, 1308 (1929), affd. 56 F.2d 917 (8th Cir. 1932), cert. denied 287 U.S. 606 (1932) (circulation contest); see *Houston Natural Gas Corp. v. Commissioner,* 90 F.2d 814 (4th Cir. 1937), cert. denied 302 U.S. 722 (1937) (solicitors).

None of the prior cases held that the purchase of another newspaper or its circulation was an expenditure to establish or increase circulation. To the contrary, it was well settled that amounts expended to purchase another newspaper, its circulation, or to eliminate competition were a capital expenditure. *Willcuts v. Minnesota Tribune Co.,* 103 F.2d 947 (8th Cir. 1939), cert. denied 308 U.S. 577 (1939); *Public Opinion Pub. Co. v. Jensen, supra; Newspaper Printing Co. v. Commissioner,* 56 F. 2d 125, 127 (3d Cir. 1932), affg. 17 B.T.A. 452 (1929); see *Houston Natural Gas Corp. v. Commissioner, supra.* However, a prize given to a solicitor in a circulation contest could have been either an expenditure to maintain circulation or an expenditure to increase it, depending on whether it was made for the purpose of obtaining a net increase in circulation. The uncertainty surrounding the determination of this sometimes difficult question prompted Congress to grant relief.

Petitioner relies upon *Triangle Publications, Inc.,* 54 T.C. 138 (1970). In that case, the taxpayer purchased all of the stock of its franchisee and attempted to deduct the cost of acquisition in excess of its net asset value. The excess was found to be for the purpose of insuring that the taxpayer had unhampered use of the franchisee customer list. One issue in that case was whether the franchisee was "another publisher" as that term is used in section 173. We found under the particular facts of that case that the franchisee was not "another publisher." Section 173 provides that a deduction is not allowable for "expenditures for the purchase of land or depreciable property or for the acquisition of circulation through the purchase of any part of the business of a publisher of another newspaper."

Florida Publishing attempts to deduct what it contends was a premium paid for all the assets of the Record to protect the circulation of Florida Publishing. In doing so, however, Florida Publishing comes squarely within the prohibition of section 173 because it acquired the circulation of another publisher. Moreover, acquisition of the circulation of the Record was the primary purpose of the acquisition. It was not, of course, acquired

for the purpose of expanding the circulation of Florida Publishing but was, instead, acquired for the purpose of preventing its acquisition by a potential competitor of Florida Publishing. Accordingly, we hold that no portion of the purchase price of the Record is deductible as an expenditure to establish, maintain, or increase the circulation of petitioner's newspaper within the purview of section 173.

Assuming arguendo that it paid an amount in excess of the value of the Record's assets, no loss would result from payment of a premium because the petitioner did not sell, exchange, or otherwise dispose of the Record in 1966 and thus did not realize any loss evidenced by a closed and completed transaction or fixed by identifiable events. Accordingly, the cases[2] petitioner relies upon in support of its argument that section 165 is applicable are inapposite and petitioner cannot deduct any portion of the purchase price of the Record as a loss under section 165. Sec. 1.165-1(b), Income Tax Regs.; see *Coalinga-Mohawk Oil Co. v. Commissioner*, 64 F. 2d 262 (9th Cir. 1933), affg. 25 B.T.A. 261 (1932), cert. denied 290 U.S. 637 (1933). Anticipated but unrealized losses are not deductible. See *W. L. Dunn*, 14 B.T.A. 13 (1928); *Schuman Piano Co.*, 10 B.T.A. 118 (1928). In addition, and for reasons subsequently discussed, we do not believe petitioner's cases lend support to the argument that it is entitled to a deduction under section 162.

Acquisition of a going business is a capital transaction. *Saline Motor Co.*, 22 B.T.A. 874 (1931). In acquiring the business of the Record, petitioner obtained, in addition to the tangible assets, the going-concern value, circulation structure, and such other goodwill, advantages, or benefits that were inherent in the business.

We do not conclude that petitioner paid more than the fair market value for the Record. The desire of petitioner to protect its circulation does not amount to a "compulsion on the part of the buyer" as that expression is used in the definition of fair market value. Petitioner was competing for the purchase of the Record and a sale between unrelated parties dealing at arm's

---

[2] The petitioner relies inter alia upon *Waterman, Largen & Co., Inc. v. United States*, 419 F. 2d 845 (Ct. Cl. 1969); *F S Services, Inc. v. United States*, 413 F. 2d 548 (Ct. Cl. 1969); *Booth Newspapers, Inc. v. United States*, 303 F. 2d 916 (Ct. Cl. 1962); *Electrical Fittings Corp.*, 33 T.C. 1026 (1960); *Tulane Hardwood Lumber Co.*, 24 T.C. 1146 (1955); *Bagley & Sewall Co.*, 20 T.C. 983 (1953), affd. 221 F. 2d 944 (2d Cir. 1955).

length is the best evidence of fair market value.[3] Different purchasers see different benefits in making acquisitions and such benefits do not necessarily give rise to calling a portion of the acquisition cost a "premium."

Under the residuary method of valuation, amounts paid in excess of the stipulated value of the tangible assets are properly attributable to intangible capital assets and thus are not currently deductible under section 162. *Jack Daniel Distillery v. United States*, 379 F. 2d 569 (Ct. Cl. 1967); *Philadelphia Steel & Iron Corp. v. Commissioner*, 344 F. 2d 964 (3d Cir. 1965), affg. per curiam a Memorandum Opinion of this Court; *Copperhead Coal Co. v. Commissioner*, 272 F. 2d 45 (6th Cir. 1959), affg. a Memorandum Opinion of this Court; *Saline Motor Co., supra.* Although petitioner may have purchased the Record to maintain and protect its own circulation from outside competition, it is well settled that expenditures to suppress or eliminate competition are capital in nature. *Falstaff Beer, Inc. v. Commissioner*, 322 F. 2d 744 (5th Cir. 1963), affg. 37 T.C. 451 (1961); *Houston Natural Gas Corp. v. Commissioner*, 90 F. 2d 814 (4th Cir. 1937), cert. denied 302 U.S. 722 (1937); *Public Opinion Pub. Co. v. Jensen*, 76 F. 2d 494 (8th Cir. 1935), affg. 6 B.T.A. 1255 (1927); *Newspaper Printing Co. v. Commissioner*, 56 F. 2d 125 (3d Cir. 1932), affg. 17 B.T.A. 452 (1929). Moreover, the expenditure in question secured an advantage or benefit to the petitioner which will last at least as long as it controls the Record. Since an expenditure which secures a benefit lasting beyond the current taxable year is capital in nature, it is not currently deductible under section 162 regardless of the underlying motivation for the expenditure. *Falstaff Beer, Inc. v. Commissioner, supra; Nachman v. Commissioner*, 191 F. 2d 934 (5th Cir. 1951), affg. 12 T.C. 1204 (1949); *Lots, Inc.*, 49 T.C. 541, 550-551 (1968), affd. sub nom. *Christie v. Commissioner*, 410 F. 2d 759 (5th Cir. 1969); *Louisiana Land & Exploration Co.*, 7 T.C. 507, 515 (1946), affd. 161 F. 2d 842 (5th Cir. 1947).

Notwithstanding the foregoing, the petitioner argues that the above-cited cases are not controlling because they were decided prior to *Commissioner v. Lincoln Savings & Loan Assn.*, 403 U.S. 345 (1971), which petitioner contends redefined the standards for determining whether an expenditure is deductible under

---

[3] *Moss American, Inc.*, T.C. Memo 1974-252.

section 162 (or should be capitalized under section 263) as follows (403 U.S. at 354):

the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year.

What is important and controlling, we feel, is that the * * * payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset * * *

Relying on *Commissioner v. Lincoln Savings & Loan Assn., supra,* as interpreted in *Briarcliff Candy Corp. v. Commissioner,* 475 F. 2d 775 (2d Cir. 1973), revg. and remanding a Memorandum Opinion of this Court, petitioner urges that even if the expenditure in question had some residual benefit beyond the taxable year in issue, it should not be capitalized. Instead, citing numerous cases,[4] petitioner concludes that to the extent the purchase price exceeds the fair market value of the Record, the excess is fully deductible under section 162 as an expenditure to protect and maintain the existing business of Florida Publishing Co.

The test cited by petitioner from *Commissioner v. Lincoln Savings & Loan Assn., supra,* does not aid petitioner because it purchased all the assets of the Record. Although petitioner's motive for purchasing the assets of the Record may have been to protect its own circulation from encroachment by another newspaper, it, nevertheless, acquired a complete going business. Moreover, petitioner continued to operate the Record as a separate and distinct business. *Briarcliff* is likewise distinguishable because the Court of Appeals concluded that the promotion expenses of the taxpayer did not create a new asset under the rationale of *Lincoln Savings & Loan Assn.* Obviously, *Briarcliff* is distinguishable for the same reason that *Lincoln Savings & Loan Assn.* is distinguishable; i.e., Florida Publishing

---

[4] *Grauman v. Commissioner,* 357 F. 2d 504 (9th Cir. 1966); *Allen v. Commissioner,* 283 F. 2d 785 (7th Cir. 1960); *Lutz v. Commissioner,* 282 F. 2d 614 (5th Cir. 1960); *Van Iderstine Co. v. Commissioner,* 261 F.2d 211 (2d Cir. 1958); *Commissioner v. Surface Combus. Corp.,* 181 F. 2d 444 (6th Cir. 1950); *United States v. E. L. Bruce Co.,* 180 F. 2d 846 (6th Cir. 1950); *Lincoln Electric Co. v. Commissioner,* 162 F. 2d 379 (6th Cir. 1947); *Dunn & McCarthy v. Commissioner,* 139 F. 2d 242 (2d Cir. 1943); *Helvering v. Community Bond & Mortgage Corp.,* 74 F. 2d 727 (2d Cir. 1935); *A. Harris & Co. v. Lucas,* 48 F. 2d 187 (5th Cir. 1931); *Santa Anita Consolidated, Inc.,* 50 T.C. 536 (1968); *James L. Lohrke,* 48 T.C. 679 (1967); *Cubbedge Snow,* 31 T.C. 585 (1958); *Fishing Tackle Products Co.,* 27 T.C. 638 (1957); *Charles J. Dinardo,* 22 T.C. 430 (1954); *L. Heller & Son, Inc.,* 12 T.C. 1109 (1949); *Scruggs-Vandervoort-Barney, Inc.,* 7 T.C. 779 (1946); *Robert Gaylord, Inc.,* 41 B.T.A. 1119 (1940).

expended the sum they attempted to deduct, to acquire a capital asset, the Record, and, although the acquisition was made to protect its circulation, Florida Publishing nevertheless acquired a profitable going business. See *Jackson E. Cagle, Jr.,* 63 T.C. 86 (1974), on appeal (5th Cir., Mar. 6, 1975).

*Commissioner v. Lincoln Savings & Loan Assn., supra,* did not redefine or otherwise alter the previously discussed, well-settled rules for determining whether an expenditure must be deducted or capitalized. See *United States v. Mississippi Chemical Corp.,* 405 U.S. 298 (1972). We have already held that no portion of the amount paid for the Record represents a premium deductible under section 162. The remaining cases cited by petitioner merely support the proposition "that expenditures made to protect and promote the taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible." *Fishing Tackle Products Co.,* 27 T.C. 638, 644 (1957).

None of petitioner's cost in acquiring the Record is deductible under section 173, 165, or 162 of the Code. Accordingly, the Commissioner's determination is sustained.

*Decision will be entered for the respondent.*