## WALSH HOLYOKE STEAM BOILER WORKS, Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4154.

Circuit Court of Appeals, First Circuit.

Feb. 27, 1947.

Samuel S. Dennis, 3d, of Boston, Mass. (Edward J. Keelan, Jr., and Hale and Dorr, both of Boston, Mass., on the brief), for petitioner.

Melva M. Graney, Sp. Asst. to the Atty. Gen. (Sewall Key, Acting Asst. Atty. Gen., J. Louis Monarch and Newton K. Fox, Sp. Assts. to the Atty. Gen., on the brief), for Commissioner.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

A decision of the Tax Court now under review determined that there was a deficiency in the excess profits tax of petitioner Walsh Holyoke Steam Boiler Works, Inc., for the calendar year 1941 in the amount of $20,584.41. In so deciding, the Tax Court upheld a ruling by the Commissioner that the taxpayer's average equity invested capital as claimed in its excess profits tax return for 1941 should be reduced in the amount of $298,758.27.

The facts, which were all stipulated, may be summarized as follows: Petitioner is a Massachusetts corporation, organized in 1928 as the successor of a partnership. It was authorized to issue 5,000 shares of capital stock having a par value of $100 per share. It issued 3,013 shares to the former partners in exchange for the partnership assets.

On May 1, 1928, petitioner issued 6½% debenture bonds, due May 1, 1938, in the amount of $250,000. Petitioner also issued its interest-bearing promissory notes in an aggregate amount of $135,642. Neither the debenture bonds nor the promissory notes had at any time been secured by a mortgage or other lien on the property of petitioner.

For a number of years petitioner operated at a loss. On July 19, 1929, the holders of its bonds and notes secured the deposit with a voting trust of more than 85% of its outstanding stock. The trustees of the voting trust became directors of petitioner and assumed the management and control of its affairs.

Although petitioner continued thereafter to operate at a loss, the interest requirements on its bonds and notes were met for a time and, through the operation of a sinking fund, bonds to the extent of $86,000 had been retired prior to December 1, 1932, leaving a balance of outstanding bonds in the amount of $164,000. At that time the noteholders objected to a continuance of bond retirements without provision for payment of their notes, with the result that, on December 1, 1932, a protective

committee was formed with which were deposited all the notes and most of the outstanding bonds.

The interest payments on both the bonds and the notes were defaulted as of October 1, 1933.

After extensive negotiations between the protective committee and Vincent P. Marran, one of petitioner's principal stockholders, an agreement was concluded and executed in May, 1936, under which Marran purchased all the outstanding notes and all but $500 of the outstanding bonds at about 20 cents on the dollar. Marran paid $56,428.40 for bonds of the face amount of $163,500 with unpaid interest thereon of $38,492.32, and notes of the face amount of $135,642 with unpaid interest thereon of $26,123.95.

On December 16, 1936, petitioner's charter and by-laws were amended to change its authorized capital stock from 5,000 shares of $100 par value to 15,000 shares of no par value. Thereafter petitioner issued 9,394 shares of its new no par stock and $65,000 face value of new 5½% debenture bonds to Marran in exchange for the above-described old debenture bonds and notes which, with interest, aggregated $363,758.27. Petitioner also issued 5,606 shares of the new no par stock in exchange for the 3,013 shares of $100 par stock then outstanding. As a result of these transactions petitioner's capital stock held by Marran increased from 29% to 73% of the outstanding shares.

At this point we shall state, no doubt in oversimplified form, the provisions of the excess profits tax now relevant.

The "excess profits credit" (I.R.C. § 712, 26 U.S.C.A. Int.Rev.Code, § 712) is the statutory measure of normal profits exempt from the excess profits tax. At the option of the taxpayer it may be computed by the average earnings method (§ 713) or by the invested capital method. The latter was the method chosen by the present petitioner.

Under the invested capital method, the "excess profits credit" is a fixed percentage of the "invested capital" (§ 714), deemed to be a fair return in normal times upon the amount invested in the enterprise.

"Invested capital" is the "average invested capital" for the taxable year, with certain adjustments not now important (§ 715).

The "average invested capital" for the taxable year is the aggregate of the "daily invested capital" for each day of the year, divided by the number of days in the year (§ 716).

The "daily invested capital" for any day of the taxable year is the sum of the "equity invested capital" for such day plus the "borrowed invested capital" for the same day (§ 717).

Passing by for the moment § 718, which prescribes the method for the daily determination of the "equity invested capital," § 719 provides that the "borrowed invested capital" for any day of the taxable year shall be an amount equal to 50 per centum of the "borrowed capital" for such day, "borrowed capital" being defined as "the amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust," plus certain additions not now pertinent.

Section 718 is the crucial section in this case, and the portion with which we are now concerned is as follows:

"§ 718. Equity invested capital (a) Definition. The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts * * *

"(1) Money paid in.

"Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) Property paid in.

"Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * *."

In its excess profits tax return for 1941, petitioner claimed an average invested capital of $626,567.49 and an excess profits tax credit of $50,125.40 (8% of average invested capital). The average equity invested capital claimed was $600,058.27, and the average borrowed invested capital $26,509.22. The equity invested capital consisted of $301,300, representing the par value of the stock originally issued in exchange for the assets of the partnership, and $298,758.27, representing the face amount of $163,500 of the old bonds and the face amount of $135,642 of notes, plus unpaid interest on such bonds and notes of $64,616.27, less $65,000, the face amount of the new 5½ per cent bonds. There was included in the borrowed invested capital of $26,509.22 the sum of $16,287.67, representing "new 5½ per cent bonds of face value of $25,000 during the portion of the year they were outstanding ($40,000 face value of the new 5½ per cent bonds were retired prior to 1941, and the remainder of $25,000 was retired during 1941)."

The only question now before us is the correctness of the Commissioner's ruling, upheld by the Tax Court, that the aforesaid sum of $298,758.27 should be eliminated from petitioner's average equity invested capital for the taxable year. The Commissioner allowed the amount of $26,509.22 claimed as petitioner's average borrowed invested capital, and that is not in issue.

Petitioner, in claiming the sum of $298,758.27 as part of its equity invested capital, was evidently uncertain what portion of § 718 was applicable, for in its return it described the sum inexactly as "Money paid in for stock, or as paid-in surplus, or as a contribution to capital; property paid in for stock, or as paid-in surplus, or as a contribution to capital."

Before us, petitioner's main argument was that the disputed sum came within § 718(a) (1) as "money previously paid in for stock". Briefly, the argument ran as follows: When a bondholder, in connection with a recapitalization, exchanges bonds for stocks, the new securities become substituted for the old securities, and the invested capital for excess profits tax purposes is represented by the new stock, or, to use the words of the statute, becomes "paid in * * * for stock." While it is true that the property (presumably cash) which constituted a part of the original investment in petitioner was paid in for bonds in the first instance, yet upon the substitution of stock for bonds it became paid in for stock within the meaning of the statute.[1] The new stock represents the old invested capital (the money paid originally for the bonds), except to the extent of the face amount of the new bonds, which still represents borrowed capital.

If the situation had remained as it was just before the recapitalization in 1936, petitioner would have had an invested capital, roughly speaking, of $451,121, representing $301,300, the par value of the original issue of 3,013 shares of capital stock (equity invested capital), plus $149,821, or 50% of the face amount of the outstanding bond and note indebtedness ($164,000 and $135,642, respectively, interest not included). Accepting petitioner's contention, the result of the recapitalization in 1936 would have been a large increase of the invested capital, with a corresponding increase of the excess profits credit and a corresponding reduction in the amount of income subject to the excess profits tax, although in plain fact not a dollar of additional working capital was thereby brought into the enterprise. The old bondholders and noteholders closed out their investment at a loss when they sold their bonds and notes to Marran at 20 cents on the dollar. The new stock and $65,000 of new bonds which Marran received in the recapitalization of 1936 were presumably at least the equivalent of petitioner's defaulted old bonds and notes

---

[1] Quite illogically, petitioner included as equity invested capital not only the money originally paid for the bonds and notes, but also the sum of $64,616.27, representing accrued interest on such indebtedness. Under § 719, borrowed invested capital does not include interest. If petitioner's argument were sound, that the borrowed invested capital became, by substitution, equity invested capital, the unpaid interest could not be included.

which Marran turned back in exchange. Since Marran had paid only $56,428.40 for the old bonds and notes, Marran probably made a gain upon the exchange, though if the recapitalization in 1936 was a tax-free reorganization (as assumed by the Tax Court), such gain was not taxable at that time.

In support of its substitution argument, petitioner cites Commissioner v. Capento Securities Corp., 1 Cir.1944, 140 F.2d 382. That case decided only that when bonds were turned in to an insolvent debtor corporation in exchange for stock, this was not such cancellation or discharge of indebtedness as constituted realization of income to the corporation within the doctrine of United States v. Kirby Lumber Co., 1931, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed 131. See also Commissioner v. Motor Mart Trust, 1 Cir. 1946, 156 F.2d 122. The Capento case was not concerned with § 718, which has its own special purpose.

True, petitioner's financial statement was improved by the recapitalization, to the extent of a net reduction of $298,758.27 of outstanding indebtedness. But under § 718, financial statement improvements do not as such augment equity invested capital, any more than do financial statement deteriorations as such decrease the amount of equity invested capital for excess profits tax purposes. Equity invested capital is comprised of money or property paid in for stock, or as paid in surplus, or as a contribution to capital. The capital paid in by the original bondholders in 1928 was in fact not "money previously paid in for stock"; it was borrowed capital rather than equity invested capital, and as long as the bonds remained outstanding, 50% of their face amount, as borrowed invested capital under § 719, became part of petitioner's invested capital pursuant to §§ 715–717. Incidentally, that capital was paid in by the original bondholders, not by Marran. The original bondholders never substituted a stock investment for their bond investment.

If the original bondholders, having paid for the bonds at par, had later accepted an issue of stock in exchange for the bonds, we suppose that the effect of the recapital-ization on petitioner's "invested capital" would have been the same as if the money paid in by the bondholders had been "money previously paid in for stock." That, however, would apparently not be because of any substitution theory under § 718(a) (1), but because the transaction would fall within § 718(a) (2). The Tax Court assumed, we think correctly, that a corporation's obligations, when turned in for stock, may be regarded as "property" within the meaning of § 718(a) (2). But in that view, this "property" is included in equity invested capital "in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange." Since the recapitalization would constitute a tax-free reorganization, the "property" would be carried into the corporation's equity invested capital at the transferring-bondholders' basis, presumably cost, which in the case supposed would be the face amount of the bonds.

We see nothing in the language of § 718 or in the underlying purpose of the excess profits credit to warrant the favorable tax result contended for by petitioner. If such had been the intention of Congress, it would have been a simple thing to provide that, where bonds or notes of a debtor corporation are turned in for stock, the face amount of the indebtedness, plus unpaid interest, is to be carried into the corporation's equity invested capital.

■ In the present case, to the extent that petitioner's "outstanding indebtedness" was reduced by the recapitalization, it necessarily followed that there had to be a corresponding reduction in the "borrowed invested capital" component of petitioner's invested capital (§ 719). The Tax Court recognized that under § 718(a) (2) there might at the same time have been some increase in petitioner's equity invested capital. But since the Commissioner's determination was presumptively correct, petitioner had the burden of establishing the amount of such increase. This it failed to do. We agree with what the Tax Court said on this point:

"We do not know, however, what portion of the old obligations was paid in for the stock and what portion for the new bonds.

The stipulation contains no facts upon which we can make any reasonable allocation. It gives no inkling of the value, if any, of either the stock or the bonds. The stock was of no par value. We are not told what assets petitioner had, what its business outlook was in 1936, or even in what business it was engaged. From the facts stipulated we do not see how the stock could have had any substantial value at the time of the recapitalization. Petitioner had been operating at a loss for a number of years and was heavily in debt. Its principal creditors, who were in control of its operations, were willing to accept 20 cents on the dollar for its obligations.

"We do not have any evidence as to the relative values of the new bonds and stock. Generally bondholders are preferred over stockholders in a liquidation. We do know that the bonds were all redeemed prior to or during the taxable year 1941.

"Thus we are unable to determine on the facts before us what part, if any, of the old obligations were paid in to petitioner for stock."

Petitioner's main argument has already been dealt with. Its alternative contention, advanced not too enthusiastically, was that, to the extent of the net reduction of indebtedness resulting from the recapitalization, namely, $298,758.27, Marran, the stockholder-creditor, must be considered to have gratuitously "forgiven" such indebtedness, with the intention of making a contribution to capital, citing Commissioner v. Auto Strop Safety Razor Co., Inc., 2 Cir. 1934, 74 F.2d 226; Carroll-McCreary Co., Inc., v. Commissioner, 2 Cir. 1941, 124 F.2d 303. Therefore, it was said, the amount of the obligations forgiven (the face amount of the bonds and notes, plus the accrued interest, less the new bonds issued) constituted "property" paid in by Marran as a "contribution to capital" within the meaning of § 718(a) (2). Without considering other objections to the argument, the short answer is that this is not the form in which the transaction was cast. There was nothing gratuitous about the transaction so far as Marran was concerned. In turning back the old bonds and notes to petitioner, he exacted in exchange a full quid pro quo. He received new bonds of a face value of $65,000, which was more than he had paid for the purchase of both the bonds and notes, and in addition he received 9,394 shares of new no par stock.

The decision of the Tax Court is affirmed.