## LINCOLN ELECTRIC CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10333.

Circuit Court of Appeals, Sixth Circuit.

June 5, 1947.

Thomas V. Koykka and Ashley M. Van Duzer, both of Cleveland, Ohio (Ashley M. Van Duzer, Thomas V. Koykka, and McKeehan, Merrick, Arter & Stewart, all of Cleveland, Ohio, on the brief), for petitioner.

DeWitt M. Evans, of Cleveland, Ohio (Sewall Key, Helen R. Carloss, Maryhelen Wigle, Hilbert P. Zarky, and J. P. Wenchel, all of Washington, D. C., and DeWitt M. Evans, of Cleveland, Ohio, on the brief), for respondent.

Before HICKS, SIMONS and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

In its return for the year 1940 the petitioner, as taxpayer, deducted from gross income premiums upon an employees' retirement annuity policy taken out in 1936, and in its return for 1941 the taxpayer deducted premiums of like character and a payment made in that year into a trust for the benefit of its employees. The Commissioner disallowed the deductions, determined a deficiency for each year in income, declared value excess profits and excess profits, and upon review the Tax Court sustained the Commissioner. The taxpayer seeks a review of its decision.

Petitioner's main reliance is upon §§ 22 and 23 of the Internal Revenue Code, 26 U.S.C.A. § 22 et seq. Section 22 defines gross income as including gains, profits and income derived from businesses, and § 23 provides that in computing net income there shall be allowed as deductions: "(a) (1) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *."

The taxpayer's position is that the payments sought to be deducted constituted "compensation for personal services actually rendered," and were within "the ordinary and necessary expenses paid or incurred during the taxable year in carry-

ing on * * * trade or business." It further contends that if these payments were not allowable deductions under § 23(a) (1) they are allowable under § 22(a) as part of the cost of goods sold, in view of regulation 103, § 19.22(a)-5. The Commissioner denied that the payments were compensation to the taxpayer's employees, or they were ordinary and necessary or should be included in the cost of manufactured goods. The Tax Court sustained the Commissioner in all respects.

For complete understanding of the background against which the present controversy must be viewed, it is necessary to sketch some of the taxpayer's history, to understand the purpose of its incentive plan and to appraise its results in employee loyalty and cooperation leading to increased production, lower costs, greater profits and the lowering of prices for its products. The taxpayer manufactures and sells electric arc welding machines, electrodes and welding supplies, with its office and plant in Cleveland, Ohio. In 1918 it experimented with a relatively mild incentive system by paying a bonus to its employees. It did not produce expected results. In 1934, however, in discussions with its employees, there emerged a proposal for an annual bonus, and in 1936, at the suggestion of the Employees' Advisory Board, whose membership of 26 includes 22 workers in the plant, the taxpayer added the employees' retirement annuity policy which is here involved, and in 1941, again at the suggestion of the Employees' Advisory Board, the trust was created. Of the effect of these incentive provisions the court, in its findings, observed: "Since 1934 petitioner's operations have been successful and profitable. This has in large measure been due to its policy of generous treatment of its employees, which has resulted in the building up of a force of loyal and efficient workers. By this treatment it has avoided work stoppages and other labor troubles. * * * Since 1934, although petitioner's earnings have consistently increased, the price at which it sells its products to the public has consistently decreased."

This appraisal of the results of the taxpayer's labor policy sufficiently illuminates the picture, even if a model of understatement in view of undisputed evidence that in the eight year period ending in 1941, the productivity of the individual employee, measured in terms of units produced, increased more than threefold, the hours of direct labor required to manufacture a given unit was cut in half, the selling price of its product was reduced by nearly one-half, the dividends per share of stock were more than tripled and the earned surplus and undivided profits doubled. There was cumulative and uncontradicted testimony at the trial that the various elements of the taxpayer's incentive system, including its high piecework rate, the bonus, the annuity plan and the trust fund were responsible for these results, through a high degree of labor-management cooperation.

If the court's appraisal is diluted by its finding that "Another factor contributing to its success is the fact that it has developed and designed new machine tools and appliances and many improvements in standard power tools permitting their operation at greatly increased speeds, resulting in largely increased production," it would seem that the finding should have been based upon evidence that such improvements were not available to other manufacturers, and was not in rejection of undisputed evidence that most of the improvements in tools and appliances were the result of employee suggestions.

The group retirement annuity policy here involved was purchased in 1936 from the Sun Life Insurance Company of Canada. It provides for payment to employees covered therein, a retirement annuity computed under tables there set forth. Originally the policy included only those earning under $3,500 annually. In 1938 this limitation was removed. Branch office employees were added as beneficiaries in 1939 and salesmen in 1940. All employees are now covered who have been in the taxpayer's employ for one year and are between the ages of 15 and 60. All annuities purchased are fully paid and require no further annual payments. While the taxpayer was not required by the terms of the contract, to purchase additional annuities in subsequent years, it did so in each year between 1936 and 1941. The retirement

age is 60, when the annuity is paid directly to the employee by the insurer. In the event an employee dies or his employment is terminated for any cause other than disability, all his rights are forfeited except where the annuity already accrued is equal to the employee's annual salary or $3,500, whichever is less. In that case the annuity becomes the property of the employee. In all other cases the annuity is canceled and the premiums which had been paid for it are applied by the insurer upon the purchase of additional annuities for other employees. In no event can the money return to the taxpayer. No individual contracts were delivered to employees and they were not informed as to the amount allocated to each of them.

Between 1936 and 1941 more than $2,-000,000 in premiums were paid to the insurer by the taxpayer, and to and including 1939 were allowed by the Commissioner as permissible deductions. In 1940 the taxpayer paid out over $400,000 and in 1941 over $575,000. These are now disallowed in view of the deficiency assessments made by the Commissioner and their redetermination by the Tax Court.

The employees' trust was set up at the end of 1941. By its terms $1,000,000 was paid to the Cleveland Trust Company as trustee, to be held in trust for all those employed by the taxpayer on December 31, 1941, excluding salesmen, the president and the chairman of its board of directors. The money, together with earnings thereon, was to be distributed at the end of 10 years, or sooner, each employee to receive an amount based on the ratio which his compensation from January 6, 1941, to December 5, 1941, bore to the total compensation of all beneficiaries. By resolution of the taxpayer's board of directors, the trust was denominated as "additional compensation on account of the value of services rendered," and was intended to provide separation allowances to employees who might be dropped after the termination of the war emergency and the reduction in production volume that was expected to follow. The taxpayer reserved no interest in the trust fund and trust assets could not be invested in the stock or obligations of the taxpayer or of any sub-

sidiary. The beneficiaries were not informed of their respective shares or interests in the trusts. At the time of distribution the funds were to go to or for the benefit of the beneficiaries, if living, or to the benefit of the spouse, children, executor or administrator of his estate if deceased. The shares were to be distributed not later than 10 years after the creation of the trust, but could be distributed earlier upon direction of the Employees' Trust Advisory Committee. This Committee consisted of three persons, two of whom were required to be beneficiaries, and was charged with the responsibility for carrying out the plan.

■ In the determination of the controversy, we have first to consider the extent of our power to review. For the Commissioner it is argued that the decisions of the Tax Court that the disallowed deductions constitute neither compensation for services rendered nor ordinary and necessary expenses, are factual, that they involve accounting practices, and if they have any substantial basis in the evidence we have no power to set them aside. This is in reliance upon Dobson v. Com'r, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, followed in Com'r v. Scottish American Investment Co., Ltd., 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113; John Kelley v. Com'r, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278, and McDonald v. Com'r, 323 U.S. 57, 65 S.Ct. 96, 89 L.Ed. 68, 155 A.L.R. 119. However, in Trust Under the Will of Bingham v. Com'r, 325 U.S. 365, 65 S.Ct. 1232, 1234, 89 L.Ed. 1670, the court had under consideration the interpretation of the phrase "all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income * * *." It held that, notwithstanding the weight of the Tax Court's decision, the purpose of the section raised questions of law reviewable by the court, a view highlighted though not approved by Mr. Justice Frankfurter. The court was interpreting the meaning of phrases in a statute and concluded that such interpretation involved questions, decision of which was unembarrassed by any disputed question of fact or any necessity to draw an inference of fact from basic findings. We

are likewise confronted with a construction of statutory terms, and conceive the problem to be identical with that posed in the Bingham case, and to raise a clear-cut question of law. Except for the case of John Kelley v. Com'r, supra, the Bingham case appears to be the last word upon the power to review statutory interpretation and the Kelley case does not repudiate Bingham even though the court speaks through Mr. Justice Frankfurter. The court there dealt with "well understood words as used in the tax statutes —'interest' and 'dividends.' They need no further definition." [326 U.S. 521, 66 S.Ct. 304.] The Seventh Circuit Court of Appeals takes the same view of Bingham as do we. Rassenfoss v. Com'r, 158 F.2d 764. Our own conclusion is already of record in Com'r v. McWilliams, 6 Cir., 158 F.2d 637, 638.[1]

■ The taxpayer, though insisting that we are not prevented from reviewing decision by the Dobson rule, for the first time suggests that Dobson is no longer applicable in view of the recently enacted Administrative Procedures Act, 5 U.S.C.A. § 1001 et seq. To this the Commissioner replies that the Tax Court is not within the purview of the Act because it specifically excepts courts and applies only to agencies of the government. His reliance is upon a letter of the Attorney General to the Senate Judiciary Committee written, during the pendency of the bill, in response to an inquiry from its chairman.

The Board of Tax Appeals was, however, by the language of the statute creating it, 53 Stats. 158, 26 U.S.C.A. § 1100, "an independent agency in the executive branch of the government." It was so held in Old Colony Trust Co. v. Com'r, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918. When by § 504(a) of the Revenue Act of 1942, its name was changed to the Tax Court of the United States, the Act expressly provided: "the jurisdiction, powers, and duties of The Tax Court * * * shall be the same as by existing law provided in the case of the Board of Tax Appeals." § 504(b). When the Supreme Court came to consider, in Com'r v. Gooch

Milling & Elevator Co., 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139, the jurisdiction of the Board of Tax Appeals to order a refund or credit a prior overpayment against a deficiency, it concluded that the Board possessed no power to grant equitable recoupment as did tribunals having general equity jurisdiction, for the Board (page 420 of 320 U.S., 64 S.Ct. 185, 88 L.Ed. 139) "is but 'an independent agency in the Executive Branch of the Government.'" That case was decided in December, 1943, after the Board of Tax Appeals had become the Tax Court of the United States. See also Hutchings-Sealy Nat'l Bank v. Com'r, 5 Cir., 141 F.2d 422. While our conclusion is that review of Tax Court decisions is governed by the Administrative Procedures Act, it does not become necessary, in view of our reliance upon the Bingham case, to particularize in what respect our power to review has been enlarged, except to say that it doubtless has been broadened and that it will be time enough to consider the precise application of the Act when clear-cut questions of fact or mixed questions of fact and law are brought to us for review.

■ We come then to a consideration whether, as a matter of law, the disallowed deductions constituted ordinary and necessary expenses paid by the taxpayer during the taxable years in carrying on a trade or business. If reasonably, and in view of the purpose of § 23(a) (1) they constitute such expenses it will not become necessary to consider whether they are allowable deductions because they constitute compensation for personal services actually rendered, and in any event we will not be obliged to determine their reasonableness, for that is concededly within the exclusive province of the Tax Court and it has given no consideration to it in view of its decision that the payments were neither ordinary and necessary expenses nor compensation. The taxpayer concedes that deductions under § 23 are permissible only by legislative grace and that it must show that the payments fall under statutory provisions authorizing their allowance. New Colonial Ice Co. v. Helvering, 292 U.S.

---

[1] See McWilliams v. Commissioner, —— U.S. ——, 67 S.Ct. 1477, decided since this opinion was announced, on June 16, 1947.

435, 54 S.Ct. 788, 78 L.Ed. 1348. That the payments sought to be deducted were expenses, should reasonably be clear. The taxpayer paid out its money for annuity premiums and for the creation of a trust. Under no circumstances could it get any of it back. Our question then is not whether these expenditures constituted expenses but whether they were ordinary and necessary as that phrase is used in the Act.

The Commissioner's reliance is upon Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 112, and Deputy, Administratrix v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416. In the first, the taxpayer sought to deduct payments to creditors of a company with which he had been connected, although the corporate debts to them had been discharged by an adjudication in bankruptcy. His purpose was to create good will for a new venture and the decision was that such expenditures were in the nature of capital outlays and not deductible as expenses. In the second, the taxpayer sought to aid the plan of a corporation in which he was a stockholder by selling stock short to executives and having the corporation lend them the purchase price. He sought to deduct payments made to the lender of the shares to compensate him for dividends received by the taxpayer on the borrowed shares. These expenditures were held not to be ordinary and necessary expenses of the taxpayer's business. Not only do these cases fail to support a conclusion that the expenses here involved are not necessary and ordinary, but the rationalization and philosophic content of Mr. Justice Cardozo's opinion in Welch v. Helvering, supra, which set the pattern for the Du Pont case, compels a contrary result. We are not alone in this, for the Second Circuit Court of Appeals drew the distinction, in reliance upon Welch, between capital outlay to acquire good will for a new business and outlay to retain an existing good will, and to prevent loss of earnings by failing to recognize a taxpayer's moral obligation. Dunn & McCarthy, Inc. v. Com'r, 2 Cir., 139 F.2d 242. See also Helvering v. Community Bond & Mortgage Co., 2 Cir., 74 F.2d 727.

The discussion in Welch v. Helvering, supra, is illuminating and of great aid to us in the solution of our present problem. There Mr. Justice Cardozo pointed out that the payments there were necessary in the sense that they were appropriate and helpful or at least the taxpayer thought they were, and the court should be slow to override his judgment. But the problem was not solved when the payments are characterized as necessary for there is need to determine whether they are both necessary and ordinary, "Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. * * * None the less, the expense is an ordinary one (lawsuit affecting a business) because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. * * * The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective." [290 U.S. 111, 54 S.Ct. 9.]

The Tax Court proclaimed its conviction that the petitioner had built up a loyal and efficient force of employees, which was an important factor in the success of its business, and that undoubtedly the preservation of that condition would be a benefit to it in the future. It reasoned, however, that even though the petitioner's voluntary payments were necessary for the development of its business, they were not ordinary expenditures, and this brings us back to the Cardozo concept of what is ordinary in consideration of the status and history of the taxpayer and of the period in which its incentive plan was formulated, pursued and enlarged, for here we deal not with an isolated act as in Welch, but may have recourse to a "fund of business experience" and to a "known business prac-

tice." It must be noted first that there was more than a strain of constancy in the plan. It was first in a small way projected as early as 1918, more fully developed in 1934, liberalized in succeeding years and added to greatly in 1941. It was pursued during an era when mass production methods were developing at an incredible speed, when the best engineering brains in industry were dedicated to improvement in tools and machines and when labor was becoming conscious of some claim to the results of labor-saving devices and increasingly vocal in demand for greater remuneration and shorter hours. It was a period of labor unrest and the petitioner was not alone in seeking means to inspire in its labor force that spirit of loyalty, efficiency and cooperation that should avoid labor strife. The Tax Court pays tribute to the success of the effort. In the words of the Welch case, "payments for such a purpose * * * are the common and accepted means of defense against attack."

' The incentive plan adopted and enlarged by the petitioner was not unique in the life of the group or the community of which it was a part. Indeed, in view of its history it was not unique in the life of the specific industry affected. The Tax Court on another phase of the controversy, observed that the benefit to employees was uncertain, indefinite and intangible and so illusory, that the taxpayer in fact retained the substance and granted only the shadow to its employees. This colored all of its reasoning. But old age security and benefits to one's family upon death, even with control of distribution lodged in a committee, are not illusory. Provisions for old age security and unemployment insurance have in recent years challenged the best thought of the nation—they have enlisted the support of government itself. It is not of controlling importance that employees were not informed as to what ultimately each would get. Clearly, that did not destroy loyalty and efficiency in the interest of the enterprise. These measures were pursued in an era when there was increasing development among workers, of a group consciousness manifested in the rapid growth of industrial unions, their demand for collective bargaining and increasingly individual sacrifice to the inviolability of the picket line. Advantage to the group had become more important than individual advantage. Moreover, as industrial units grew large the greater became the injury that might flow from labor strife, and the greater the incentive of forward looking management to seek means to avoid it. In the light of the concept of ordinary expense developed in the Welch case, even though not applicable to the facts there disclosed, we are unable to say that the petitioner's outlay for employee benefit, considering its purpose and the clearly demonstrated effectuation of that purpose through a course of years, was not an ordinary expenditure within the meaning of the statute.

The Tax Court reasoned also that the loyalty and efficiency generated among the employees of the petitioner by its incentive plan already existed at the end of 1939, and that in the face of this fact and the prospective impact of high tax rates upon current large profits, the large additional disbursements in the tax years were not necessary to preserve such loyalty and efficiency. This is a novel application to a situation in which psychological factors, group loyalties and business judgment are elements, of the old economic law of diminishing returns. The uncontradicted evidence of the phenomenal growth of the taxpayer's activity, bringing in its wake not only greater profits to itself and its stockholders, increased remuneration to its employees and a reduction in the price of its product, destroys completely the force of the suggestion, if any it had.

The record provides no clue as to why the Commissioner allowed deductions for annuity premiums from 1934 to 1939 as ordinary expenses or reasonable compensation, yet declined to do so in 1940 and 1941 though the earlier contributions were comparable in amount. Nor is it clear why the Tax Court departed from principles applied in Gisholt Machine Co. v. Com'r, 4 T.C. 699, and other cases. Its attempt to distinguish the Gisholt case was unconvincing to the dissenting judge, as it is unconvincing to us. We understand, of course, that the Commissioner

may not be constrained to constancy by any rule of estoppel, but reason and logic might have been expected to justify so complete a change of front. Finally, it is not without importance that other incentive plans for the preservation of industrial peace may be thwarted by the decision presently reviewed, even though that ground is not the legal basis for our determination. We think the Tax Court was in error in its interpretation of the law and that its decision should be set aside. So concluding, there is no purpose in discussing the payments either as compensation, or as cost of production.

Reversed and remanded to the Tax Court for proceedings in conformity herewith.