**MERCHANTS WAREHOUSE COMPANY, Inc., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 13352.

United States Court of Appeals
Sixth Circuit.

Oct. 24, 1958.

278

William Waller, Nashville, Tenn., Lawrence Dortch and Waller, Davis & Lansden, Nashville, Tenn., on brief, for petitioner.

Grant W. Wiprud, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Washington, D. C., on brief, for respondent.

Before SIMONS, Chief Judge, and MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The petitioning taxpayer, Merchants Warehouse Company, Inc., was incorporated under a Tennessee charter on March 4, 1937, to purchase and operate a five-story warehouse building, known as "Cummins Station", in Nashville, Tennessee. Before the organization of the corporate taxpayer, the warehouse property had been owned by another corporation (Wholesale Merchants Warehouse Company), which had outstanding bonded indebtedness to the amount of $550,000 secured by a deed of trust on the property.

During 1934, Wholesale Merchants Warehouse defaulted in the payment of interest due on its bonds; and the trustee in the deed of trust took over the property and operated it for the benefit of the bondholders. In an ensuing chancery court proceeding, the trustee was directed to foreclose under the deed of trust and an appraiser was appointed to report upon the valuation of the property. This appraiser, presumably an expert, reported that in his opinion the property had a value of $375,000.

At a foreclosure sale on February 8, 1937, a bondholders' committee, holding $535,000 of the total issue of $550,000 of Wholesale Merchants Warehouse Company bonds, bid in the warehouse property for $350,000 and the assumption of the 1937 taxes. Under the terms of the sale, the bondholders were privileged to tender in part payment of the purchase price bonds and coupons in proportion to their interest in the net proceeds resulting from the sale.

The bondholders' committee then organized the petitioner corporation to acquire the property and directed the trustee to deed the property to the new corporation. In exchange therefor, the petitioner issued to the committee for distribution to the depositing bondholders $535,000 of new fifteen-year, five percent bonds in addition to all the tax-

payers' authorized stock, consisting of 535 shares of non-par common stock. Money had been accumulated from the operation of the warehouse by the trustee. A part of this money was used to pay the few non-depositing bondholders at the rate of $686.97 for each one-thousand-dollar bond. The remaining balance was paid over to the taxpayer as the new owner of the property. $5,-350 of this balance was credited by the taxpayer to its capital account, giving the 535 shares issued a paid-in value of $10.00 each. The remainder of the fund was distributed *pro rata* to the depositing bondholders who received, for each bond deposited, a $1,000 bond of the petitioner, one share of its stock and $22.70 in cash.

At a meeting a few days after the incorporation of the new company, its incorporators adopted a resolution that the warehouse property acquired had a fair market value of $600,000 and that this amount should be set up on the books of the company as the fair value of the property. Admittedly, the Cummins Station property was "almost ideally located from a distributing standpoint for interstate, suburban and local commerce." It was also excellently situated in relation to principal highways and railroads, with two private switch tracks adjacent to it, thus eliminating drayage in connection with railroad shipments.

However, the warehouse building that had been erected thirty-one years before had been badly used and was in need of repair, fresh paint and new window sills. The inside walls, heating plant, floors and some elevators were in poor condition. The gross rental had declined from a high in 1928 of $94,791.30 to a low in 1934 of $46,468.60. At the time of the sale of the property, only about eighty percent of the floor space was rented and no tenant was obligated to a lease for a term of more than a year. At the rate of rental, had the full floor space of the building been rented throughout 1937, the annual gross rental for the warehouse would have been $62,268. In 1937, assessments on the property were for city taxes placed at a valuation of $375,000 and for state and county taxes placed at $500,000.

The court-appointed appraiser, Whitsitt, in estimating the value of the property, considered its prime location, past earnings, current rentals and reproduction costs. Economic conditions and the real estate market in Nashville improved markedly in 1937. New warehouse buildings had been constructed and rented at annual rentals of twenty-seven and twenty-eight cents per square foot of floor space as contrasted with fifteen and seven-tenths cents per square foot of floor space rentals in the Cummins Station property. The ownership of most of the petitioner's bonds and stock remained in the old bondholders until September of 1943, during which time the rents were not raised and the interest on the income bonds was not paid in full.

In September, 1943, G. L. Comer, a clothing manufacturer who was one of the tenants of the warehouse company, acquired $519,000 par value of the income bonds and 519 shares of the stock of petitioner for a total consideration of $343,-350. This merchant paid a $6,000 commission to a broker for services in aiding him in the acquisition of the bonds and stock. Comer considered that he had made a bargain purchase. He promptly raised the rentals; and, after he acquired control of the property, interest in full was paid on the income bonds.

In his statutory notice of deficiency, the Commissioner of Internal Revenue determined that the total cost of the land and building when petitioner made its purchase in 1937 was $350,000, of which $250,000 should be allocated to the building and $100,000 to the land; and that, for 1943 and 1944, the respective amounts of $6,307.81 and $6,459.90 represented reasonable allowances for depreciation on the building and for subsequent additions. The declared value of petitioner's capital stock as stated on its return for the fiscal year ending June 30, 1937, was $75,000. In computing its invested capital on its excess profits tax returns for 1943 and 1944, petitioner listed the

amount of $5,350 as "Money paid in for stock, or as paid-in surplus, or as a contribution to capital."

Petitioner averred that the Commissioner erred in failing to include as equity invested capital for 1943 and 1944 the fair market value of the common stock which it exchanged, together with its bonds, for the warehouse property in March of 1937. Petitioner asserts that such stock had a fair market value of $200,000 in March of 1937. In computing its invested capital on its excess profits tax return for 1943 and for 1944, the petitioner included as borrowed capital the $535,000 in bonds which it had issued in 1937. The Commissioner determined that in computing borrowed capital for those years, petitioner was not entitled to include the $535,000 bonds at face value; that the fair market value of the property for which bonds had been exchanged in 1937 was $350,000, being the price at which it had previously been sold at foreclosure, and that consequently only that amount could be included in borrowed capital.

The Tax Court held that the petitioner's unadjusted basis for the warehouse property was that of its transferor: to-wit, the fair market value at the time of acquisition of the property by the petitioner; and that such value was determined to be $450,000, of which $300,000 was allocable to the building and $150,000 to the land. It was held further that, in computing invested capital for excess profits tax purposes, the unadjusted basis of the property must be allocated between the bonds and the stock for which it was exchanged in accordance with the fair market values of each; that, in March, 1937, the fair market value of the bonds was $375,000, and that of the stock $75,000; and that such amounts are to be included in borrowed capital and equity invested capital respectively.

■  In its opinion, the Tax Court stated that the first issue to be decided was the sole disputed point as to the proper basis to be used in determining petitioner's depreciation deductions on its warehouse building for the calendar years 1943 and 1944, the rate of depreciation having been stipulated by the parties. It was pointed out that the parties were in agreement that the exchange of the land and the building for petitioner's bonds and stock is governed by section 112(b) (5) of the 1939 Code and that, therefore, pursuant to section 113 (a) (8), 26 U.S.C.A. §§ 112(b) (5), 113 (a) (8), petitioner's basis for the property is the same as that of its transferor. The Tax Court found as a fact that the fair market value of the property in March of 1937 was $450,000, of which $300,000 was allocable to the building and $150,000 to the land. This finding was based upon an analysis of the evidence in which, not only reproduction costs were considered, but the records of past earnings and the prospect of future earnings were likewise embraced. We are unable to conclude that the Tax Court's finding was clearly erroneous. In reaching this opinion, we adhere to the principles enunciated in Lincoln Electric Co. v. Commissioner, 6 Cir., 162 F.2d 379, 9 A.L.R.2d 272; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456; E. H. Sheldon & Co. v. Commissioner, 6 Cir., 214 F.2d 655, 658, 659; and other cases cited by the petitioner. But, in so doing, we find no occasion to set aside the findings of the Tax Court as we have done in cases where in our opinion such decisions were clearly erroneous. Wright-Bernet, Inc., v. Commissioner of Internal Revenue, 6 Cir., 172 F.2d 343; and Roth Office Equipment Co. v. Gallagher, 6 Cir., 172 F.2d 452.

■■  In computing the borrowed invested capital of the petitioner for excess profits tax purposes, pursuant to section 719 of the Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, § 719, the Tax Court held that the bonds of the petitioner were included at a valuation of $375,000, derived by allocation of the unadjusted basis of the warehouse property between the bonds and the stock in proportion to their de-

ermined fair market value. We think the holding was correct. The issue arose in relation to the amount of the excess profits credit for 1943 and 1944 allowable to the taxpayer based on its invested capital in accordance with sections 712 and 714 of the 1939 Internal Revenue Code, 26 U.S.C.A. Excess Profits Taxes, §§ 712, 714. To determine such credit, invested capital means equity invested capital reflected in the corporation's stock and borrowed invested capital as reflected in the bonds and other evidences of outstanding indebtedness issued by the corporation.

■ We are in accord with this reasoning of the Tax Court: "Section 718 (a) (2) [26 U.S.C.A. Excess Profits Taxes, § 718(a) (2)] requires that property paid in for stock be included in equity invested capital at its unadjusted basis to the taxpayer. Pursuant to our determination of the first issue herein [depreciation deductions], petitioner's unadjusted basis for its warehouse property is $450,000. Since both bonds and stock were issued in exchange for this property, its $450,000 value must be allocated between the bonds and stock according to the respective values of each at the time of the exchange in order to determine the amount includible in equity invested capital and in borrowed capital. Tennessee, Alabama & Georgia Railway Co. [1949], 13 T.C. 486, affirmed [6 Cir., 1951], 187 F.2d 826; Cf. Walsh Holyoke Steam Boiler Works, Inc. [1945], 5 T.C. 814, affirmed [1 Cir., 1947], 160 F.2d 185. Although the face value of the bonds alone was in excess of $450,000, it is obvious that petitioner is not entitled to claim more than this aggregate amount for the stock and bonds in computing its equity invested capital and borrowed capital. See Southern Fertilizer & Chemical Co. v. Edwards [D.C.M.D.Ga.1955], 167 F.Supp. 879. The purpose of the invested capital credit is to establish a measure by which the amount of 'excess profits' can be determined, and before capital can be considered in computing the excess profits credit, it is required that the capital actually be invested as part of the working capital; that the capital be utilized for the earning of profits; and that the capital be subject to the risk of business. Hart-Bartlett-Sturtevant Grain Co. v. Commissioner [8 Cir.,] 1950, 182 F.2d 153, affirming [1949,] 12 T.C. 760. In short, the capital must actually be 'invested' in the business. Graves, Inc. [1951], 16 T.C. 1566, affirmed [5 Cir., 1953,] 202 F.2d 286, certiorari denied 346 U.S. 812, [74 S.Ct. 21, 98 L.Ed. 340.] Clearly, the equity and borrowed capital invested in petitioner's business in March 1937, as the result of its exchange of its bonds and stock for the warehouse property, cannot be regarded as being more than the $450,000 fair market value of the property."

■ Finally, we are in accord with the argument of the respondent Commissioner of Internal Revenue that, in the Rule 50 computation proposed by the Commissioner pursuant to the findings of fact and opinion of the Tax Court, there is a proper adjustment of the taxpayer's interest deduction in the computation of its 1944 excess profits net income pursuant to section 711(a) (2) (B) of the 1939 Code, 26 U.S.C.A. Excess Profits Taxes, § 711(a) (2) (B). This Code provision is: "The deduction for interest shall be reduced by an amount equal to 50 per centum of so much interest as represents interest on the indebtedness included in the daily amounts of borrowed capital [determined under section 719 (a)]; * * *." The Commissioner reduced the taxpayer's interest deduction in a sum equal to fifty percent of interest paid by the petitioner on its bonds. Over the objection of the petitioner, the Tax Court adopted the computation of the Commissioner. Petitioner now argues that, by the computation, there was added to normal tax net income not only one-half of the interest paid on the $375,000 of bonds allowed as borrowed capital, but also one-half of the interest paid on the $160,000 of bonds disallowed.

As argued by the Commissioner, the Code section quoted above, which requires the adjustment to excess profits net income for interest paid on indebted-

ness included in borrowed capital, does not refer to the *amount* of the indebtedness, nor to percentages of interest. It merely refers to interest on the indebtedness included in borrowed capital. The petitioner's bonds were so included. Therefore, fifty percent of the interest paid thereon is properly to be entered into the adjustment required by section 711(a) (2) (B), whether regarded as five percent of the face amount of the bonds, or as a higher percentage of the valuation of the bonds, for the purposes of borrowed invested capital computation. The plain wording of the statute requires that the amount of interest paid on the bonds must enter into the adjustment of interest deductions. The Tax Court adopted such computation.

The decision of the Tax Court is affirmed.